IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
CENTRAL ISLIP DIVISION

| | |
|---|---|
| CAPRICORN MANAGEMENT SYSTEMS, INC.<br><br>    *Plaintiff,*<br><br> v.<br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY<br><br>    *Defendant.* | Case No. 2:15-cv-02926-DRH-SIL |

**GOVERNMENT EMPLOYEES INSURANCE COMPANY'S
MOTION TO DISMISS COUNTS II AND III
<u>FOR FAILURE TO STATE A CLAIM</u>**

## TABLE OF CONTENTS

I. INTRODUCTION ...........................................................................................................1

II. FACTUAL BACKGROUND..........................................................................................2

    A. GEICO's regional office on Long Island is phasing out Capricorn's software as part of a nationwide transition to a common claims processing system. ................................................................................................................2

    B. Capricorn's software merely automates billing processes dictated by state insurance regulations and implements fraud detection techniques presented by a third-party medical doctor at an insurance industry conference. ...................................................................................................................3

III. FAILURE TO STATE A CLAIM ...................................................................................5

    A. To survive dismissal, a claim must give the defendant "fair notice" of the grounds upon which it rests and be "plausible" on its face. ....................................5

    B. Capricorn's generic trade secret allegations are implausible and fail to give GEICO "fair notice" of what Supercede software features are at issue. .................6

    C. Capricorn failed to plead specific statutory requirements of the Maryland Uniform Trade Secrets Act. ....................................................................................9

        (i) The alleged trade secrets do not have "independent economic value." ......................................................................................................10

        (ii) The alleged trade secrets were not "the subject of efforts reasonable under the circumstances to maintain [their] secrecy."..............11

IV. CONCLUSION..............................................................................................................14

# **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................ passim

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................ 5

*Conley v. Gibson*,
   355 U.S. 41 (1957) .......................................................................................................... 5

*IDX Sys. Corp. v. Epic Sys. Corp.*,
   285 F.3d 581 (7th Cir. 2002) .......................................................................................... 7

*James v. Countrywide Fin. Corp.*,
   849 F. Supp. 2d 296 (E.D.N.Y. 2012) ............................................................................ 5

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*,
   716 F.3d 10 (2d Cir. 2013) ............................................................................................. 5

*Myung Ga, Inc. v. Myung Ga of MD, Inc.*,
   C.A. No. 10-3464, 2011 WL 3476828 (D. Md. Aug. 8, 2011) ..................................... 10

*Optic Graphics, Inc. v. Agee*,
   591 A.2d 578 (Md. 1991) ............................................................................................. 10

*Structural Preservation Sys., LLC v. Andrews*,
   931 F. Supp. 2d 667 (D. Md. 2013) .............................................................................. 10

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002) ................................................................................................... 5, 9

*Synopsys, Inc. v. ATopTech, Inc.*,
   No. 13-cv-02965, 2013 WL 5770542 (N.D. Cal. Oct. 24, 2013) ................................... 9

**Statutes**

MD. CODE ANN., COM. LAW § 11-1201 ............................................................... 9, 10, 11

RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (1939)...................................... 10, 11, 12

**Other Authorities**

DANIEL J. TENNENHOUSE, M.D., ATTORNEYS MEDICAL DESKBOOK § 17:14 (4th ed. 2014).......... 4

Regulation 83–No-Fault Fee Schedule, 11 NYCRR 68, available at
   http://www.dfs.ny.gov/insurance/r68/r83.htm (last visited Sept. 13, 2015)............................... 3

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................................................... 1

Fed. R. Civ. P. 8(a)(2)..................................................................................................................... 5

Pursuant to Fed. R. Civ. P. 12(b)(6) and the Court's August 19, 2015 Order, defendant Government Employees Insurance Company ("GEICO") respectfully moves to dismiss Counts II and III asserted by plaintiff Capricorn Management Systems, Inc. ("Capricorn") for failure to state a claim upon which relief can be granted.

## I. INTRODUCTION

After learning that its lucrative software contract with GEICO would not be renewed, Capricorn filed this suit alleging that GEICO stole its alleged "trade secret" software in a transparent attempt to secure a final windfall. The software, which was developed under GEICO's direction by a Capricorn employee seated within GEICO's regional office on Long Island, automates state-mandated insurance adjustment processes and implements fraud detection algorithms developed by a third-party medical doctor and made public years ago.

The generic and sweeping allegations in Capricorn's two trade secret claims, Counts II and III of its Complaint, are implausible on their face, fail to give GEICO fair notice of what software elements are alleged to be trade secrets, and fail to plead essential prerequisites under the applicable Maryland trade secret statute. The lack of specificity in Capricorn's trade secret allegations is unsurprising since its software automates processes mandated by the state or publicly presented by others. When one looks under the hood, there are no secrets inside, not as presently pled or possible to plead in the future. GEICO respectfully moves the Court to dismiss Courts II and III for failure to state a claim upon which relief can be granted.[1]

---

[1] While not a subject of this Rule 12(b)(6) Motion to Dismiss, GEICO also denies that Capricorn is entitled to any relief on Count I, which alleges that GEICO violated the terms of a license agreement concerning the same Capricorn software by using it to process New Jersey claims in addition to New York claims. D.E. 1 ("Compl."), at ¶¶ 86-96.

## II.     FACTUAL BACKGROUND

### A.     GEICO's regional office on Long Island is phasing out Capricorn's software as part of a nationwide transition to a common claims processing system.

GEICO, the second largest provider of automobile insurance in the United States, is headquartered in Maryland but maintains a regional office in Woodbury, New York. Since the 1980s, GEICO's Woodbury office has used a software program called "Supercede" from Capricorn to process insurance claims. For many years, and continuing through the present, a Capricorn employee worked substantially full-time within GEICO's Woodbury office to develop and support that software under GEICO's direction. The software license and support contract between GEICO and Capricorn (the "Supercede License Agreement") was most recently renewed in September 2013 for a three-year term (*i.e.*, through September 2016). The contract remains in force and GEICO has continued, even after the filing of this lawsuit by Capricorn, to make the monthly royalty payments specified in the contract.

As part of GEICO's transition to a common, nationwide claims processing system, the Woodbury office is phasing out Capricorn's Supercede software and beginning to use a new "ATLAS" software program developed by a different vendor. Capricorn was invited to submit, and in fact did submit, a proposal to be GEICO's national claims processing software vendor. Ultimately, however, GEICO chose to proceed with a different vendor, partly because Capricorn does not have the resources necessary to support a nationwide application.

When Capricorn learned that GEICO had selected a different vendor and would be phasing out the Supercede software (and, therefore, not renewing the Supercede License Agreement), Capricorn initiated a campaign of false accusations against GEICO, culminating in this lawsuit. Capricorn asserts three claims in its Complaint: (1) GEICO exceeded the scope of the Supercede License Agreement (Count I); (2) GEICO breached a Non-Disclosure Agreement

2

with Capricorn by disclosing unspecified "trade secrets" to the vendor developing the new ATLAS software (Count II); and (3) GEICO violated "Maryland State law" by misappropriating the same alleged trade secrets (Count III). Capricorn seeks "an amount over $100 million dollars" in monetary damages, without specifying the basis for that demand, which is orders of magnitude more than the total value of the Supercede License Agreement.[2] *Compare id.* at ¶ 26 (pleading that the Supercede License Agreement is worth "hundreds of thousands of dollars" annually) *with id.* at 16 (demanding "over $100 million" in damages).

> **B.    Capricorn's software merely automates billing processes dictated by state insurance regulations and implements fraud detection techniques presented by a third-party medical doctor at an insurance industry conference.[3]**

As alleged in the Complaint, "Capricorn's products calculate provider fee reimbursement for No-fault and Workers Compensation, based on a particular fee schedule according to stated guidelines." Compl., at ¶ 13. In short, GEICO inputs medical invoices associated with insurance claims and Capricorn's software adjusts payouts according to guidelines promulgated by the New York State Department of Financial Services. *See, e.g.,* Regulation 83–No-Fault Fee Schedule, 11 NYCRR 68, available at http://www.dfs.ny.gov/insurance/r68/r83.htm (last visited Sept. 13, 2015). While computers are well-suited to performing such numerical lookups and calculations, and can surely perform them much more accurately, quickly, and efficiently than human claims adjusters alone, there is nothing inherently secret about the process. To the

---

[2] The $100 million damages claim includes compensation for "unjust enrichment" but the Complaint does not assert a claim for unjust enrichment, further confusing the basis for Capricorn's demand. Compl., at 16.

[3] GEICO acknowledges that Capricorn's well-pled factual allegations must be accepted as true for purposes of this motion and does not mean to challenge them here. *See infra* Section III(A). Some background regarding the software at issue, particularly the substantial extent to which its functionality is dictated by insurance regulations and third party medical research, is, however, helpful in illustrating why Capricorn's sweeping trade secret allegations are implausible and fail to give GEICO "fair notice" of what Capricorn claims as its trade secrets.

3

contrary, the details are dictated by government regulations available online for inspection by any interested person. *Id.*

The Supercede software also includes a module "to detect fraud related to Nerve Conduction Velocity testing ('NCVs')." Compl., at ¶ 34. As alleged, "NCVs are tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or 'firing,' of the nerve is measured and recorded with electrodes attached to the surface of the skin." *Id.* at ¶ 35. In plain English, NCV tests measure how quickly electrical nerve impulses travel through a patient's body. From those measurements, doctors can diagnose various neurologic disorders. *See* DANIEL J. TENNENHOUSE, M.D., ATTORNEYS MEDICAL DESKBOOK § 17:14 (4th ed. 2014).

Supercede uses two NCV fraud detection techniques, both presented by a third-party neurologist, Dr. Lawrence Spitz, at an insurance industry conference in 2009. First, Supercede checks to see whether test measurements fall within a plausible range for a human patient. Second, Supercede checks to see whether the exact same measurements were previously submitted in connection with a different insurance claim. If the results of an NCV test are implausible for a human patient or exactly duplicative of previous test results, then they are likely to be fraudulent and will be referred to GEICO investigators for follow-up before the claim is paid. Two GEICO employees saw Dr. Spitz's presentation, recognized the potential of his techniques for reducing fraudulent claims, and instructed Capricorn to implement them within Supercede accordingly.

### III. FAILURE TO STATE A CLAIM

#### A. To survive dismissal, a claim must give the defendant "fair notice" of the grounds upon which it rests and be "plausible" on its face.

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[P]laintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 306 (E.D.N.Y. 2012) (Hurley, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "[O]nly a complaint that states a *plausible* claim for relief survives a motion to dismiss." *Id.* (citing *Twombly*, 550 U.S. at 556) (emphasis added).

"Factual allegations must be enough to raise a right to relief above the speculative level … on the assumption that all the allegations in the complaint are true…." *Twombly*, 550 U.S. at 555 (citations omitted). "[T]he tenet that a court must accept as true all of the allegations

5

contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. To the contrary, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

> **B.    Capricorn's generic trade secret allegations are implausible and fail to give GEICO "fair notice" of what Supercede software features are at issue.**

Both Counts at issue here, Counts II and III, allege improper disclosure of "Capricorn's Trade Secrets," which the Complaint broadly defines as "highly customized modules and methods for maximizing efficiency in the management and adjustment of claims and information for GEICO." Compl., at ¶ 53. While the Second Circuit has not directly opined on the required degree of specificity in defining trade secret claims, numerous other circuit and district courts, including the Southern District of New York, have required alleged trade secrets to be defined with a far greater degree of specificity than Capricorn provides here. *See Big Vision Private Ltd. v. E.I. DuPont de Nemours & Co.*, 1 F. Supp. 3d 224, 258-59 (S.D.N.Y. 2014) (collecting cases). Indeed, in its pre-motion letter, Capricorn tacitly acknowledges that such a "general definition"—Capricorn's own characterization—is insufficient. D.E. 14, at 2.

Capricorn attempts to cure the deficiency by pointing to four other "specific details" within its Complaint:

> 55.    Capricorn's Trade Secrets enable the customization and automation of the claims management process.
>
> 56.    Capricorn's Trade Secrets enable enhanced fraud detection as part of the claims management process.
>
> 57.    Capricorn's Trade Secrets enable monitoring of the efficiency of GEICO employees.
>
> 58.    Capricorn's Trade Secrets enable the detection of abusive and/or fraudulent prescription of certain narcotic drugs.

*Id.* (quoting Compl., at ¶¶ 55-58). GEICO will address each in turn.

6

"Enabl[ing] the customization and automation of the claims management process" is the overarching purpose of Capricorn's software and gives absolutely no indication as to what components of the software are alleged to be trade secrets. What about the "customization and automation" does Capricorn claim as a trade secret? The layout of the user interface? The structure of the underlying database? Such a vague and expansive definition of a trade secret embodied within software fails as a matter of law. *See, e.g.*, *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (rejecting as "not plausible" a claim "both too vague and too inclusive, effectively asserting that all information in or about its software is a trade secret.")

*IDX* involved allegations of trade secret misappropriation under Wisconsin's implementation of the Uniform Trade Secrets Act, which provides substantially the same statutory definition of a "trade secret" as the Maryland statute at issue here. *Id.* at 583 (*citing* Wis. Stat. § 134.90(1)(c)). The facts alleged in *IDX* are similar to those alleged by Capricorn here. IDX provided medical billing software to a large medical group. *Id.* at 582. When that software was phased out in favor of a competing software product, IDX brought suit alleging that the medical group had improperly given its trade secrets to the new software provider so it could eventually replace IDX. *Id.* Because IDX "does not separate the trade secrets from the other information that goes into any software package," which is "vital under the statutory definition," the court rejected IDX's claim. *Id.* at 584. Capricorn's complaint suffers from the same vague and over inclusive trade secret allegations that proved fatal to IDX's claim. In short, "unless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job." *Id.* at 583.

Capricorn's other "specific" allegations are similarly unavailing. GEICO assumes "enhanced fraud detection" refers to the NCV Module described in the Complaint since no other fraud detection capability is alleged. *See* Compl., at ¶¶ 34-49. As described above, however, the

7

techniques used to detect NCV fraud—comparing reported NCV test values against a plausible range for human patients and checking for duplicate resubmission of old test results—were developed by a third-party neurologist and presented publicly at an insurance industry conference. The Complaint gives no hint of any additional elements, beyond those developed and publicly disclosed by others, Capricorn claims as its own. Accordingly, Capricorn fails to allege the existence of a trade secret.

Capricorn does not mention "monitoring the efficiency of GEICO employees" elsewhere in the Complaint and so GEICO is left to speculate as to what this allegation refers. Compl., at ¶ 57. Presumably, "efficiency" refers to how quickly GEICO employees process claims (*e.g.*, the average number of claims each employee processes in a given time period). Capricorn does not allege, and GEICO strains to see, how counting the number of claims processed by each employee over some period of time is a trade secret. To the extent Capricorn intends to refer to some more sophisticated measure of efficiency, the Complaint fails to provide adequate notice of what that might be.

The Complaint also fails to provide any indication of how Capricorn's purported trade secrets detect "abusive and/or fraudulent prescription of certain narcotic drugs." Compl., at ¶ 58. For example, simply identifying and flagging doctors who prescribe narcotic drugs substantially more often than their peers can hardly be described as a trade secret technique. Again, to the extent Capricorn intends to refer to some more sophisticated fraud detection technique, the Complaint fails to provide "fair notice" of such, impermissibly leaving GEICO to speculate about what "trade secrets" are at issue in this case.

The "specific" allegations upon which Capricon relies broadly recite commonplace insurance industry processes automated by the Supercede software and then assert that those

8

software functions are "enabled" by Capricorn's trade secrets. Compl., at ¶¶ 55-58. Such sweeping allegations are legally insufficient for two reasons. First, to claim a trade secret in merely automating commonplace insurance industry processes—processes prescribed by state regulations or developed and publicly presented by a third party—is neither "plausible" nor "reasonable" on its face. *See Iqbal*, 556 U.S. at 678. Second, to the extent Capricorn asserts that some more specific software elements underlying those commonplace functions are trade secrets, the Complaint fails to provide "fair notice" (or any notice) as to what those elements might be. *See Swierkiewicz*, 534 U.S. at 512; *Synopsys, Inc. v. ATopTech, Inc.*, No. 13-cv-02965, 2013 WL 5770542, *12 (N.D. Cal. Oct. 24, 2013) (dismissing a trade secret claim "too sweeping and vague for Defendant to be on notice of what trade secrets are at issue and where the boundary between those secrets and general knowledge might lie"). Counts II and III must, therefore, be dismissed for failure to state a claim upon which relief can be granted.

  **C.**   **Capricorn failed to plead specific statutory requirements of the Maryland Uniform Trade Secrets Act.**

To survive dismissal, both Counts II and III must adequately plead the existence of a trade secret, since one cannot improperly disclose or misappropriate a trade secret that does not exist. Capricorn pleads its trade secret claims "under Maryland State law" but fails to specify under what Maryland law it seeks relief. Maryland enacted the Maryland Uniform Trade Secrets Act ("MUTSA"), codified at MD. CODE ANN., COM. LAW §§ 11-1201, *et seq.*, in 1989. Since MUTSA long precedes the allegations underpinning Counts II and III, GEICO assumes Capricorn intended to plead its trade secret claims under MUTSA.[4]

---

[4] While still not explicitly stating that its claims arise under MUTSA, Capricorn also refers to "claims arising under the Maryland Uniform Trade Secrets Act" in its pre-motion letter submission of August 10, 2015. D.E. 14, at 2.

9

MUTSA expressly defines a "trade secret" as follows:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1)  Derives <u>independent economic value</u>, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (2)  Is the subject <u>of efforts that are reasonable under the circumstances to maintain its secrecy</u>.

MD. CODE ANN., COM. LAW § 11-1201(e) (emphasis added). Although MUTSA provides a definition, Maryland courts still look to the Restatement of Torts as providing "helpful guidance to determine whether the information in a given case constitutes 'trade secrets' within the definition of [MUTSA]." *Structural Preservation Sys., LLC v. Andrews*, 931 F. Supp. 2d 667, 679 (D. Md. 2013) (quoting *Optic Graphics, Inc. v. Agee*, 591 A.2d 578, 585 (Md. 1991)).

### (i) The alleged trade secrets do not have "independent economic value."

To be protectable as a trade secret under MUTSA, information must "[d]erive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." MD. CODE ANN., COM. LAW § 11-1201(e)(1). Rather than establish the independent economic value of its purported trade secrets, the facts as pled by Capricorn suggest just the opposite.

Capricorn alleges that it has not disclosed the software in question "to anyone other than GEICO" and, thereby, impliedly concedes that it has not licensed or sold the software to any "other persons" either. Compl., at ¶ 60; *cf. Myung Ga, Inc. v. Myung Ga of MD, Inc.*, C.A. No. 10-3464, 2011 WL 3476828, at *6 (D. Md. Aug. 8, 2011) (inferring independent economic value based on "several previous licensing agreements"). Capricorn's failure to license the software in

10

question to anyone else is perhaps not surprising since Capricorn also pleads that it was "highly customized … for GEICO." Compl., at ¶ 53. As a matter of common sense, software "highly customized" for one company is of little utility, and therefore little value, to another company.

To the extent that Capricorn's software implements more generally applicable insurance industry functionality (*e.g.*, adjusting claims based on New York State regulations), that functionality might plausibly be of value to others. Capricorn's software would still fail to meet the "independent economic value" requirement under MUTSA, however, because its value would then not be derived "from not being generally known to, and not being readily ascertainable by proper means by, other persons" but rather from the very fact that it implements well-known and common requirements applicable to others in the insurance industry. MD. CODE ANN., COM. LAW § 11-1201(e)(1).

> **(ii)** **The alleged trade secrets were not "the subject of efforts reasonable under the circumstances to maintain [their] secrecy."**

The secrecy of a trade secret is perhaps its most defining element. Maintaining that secrecy is not a casual requirement easily met. Rather, "a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information." RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (1939). In its pre-motion letter, Capricorn contends that two allegations plead the requisite secrecy:

> 59. Capricorn's Trade Secrets and related information pertaining to their creation, functionality, organization, compilation, and management are held in confidence by Capricorn as a company trade secret.
>
> 60. Capricorn does not disclose its Trade Secrets to anyone other than GEICO, to which it has made disclosures only under the terms of a Non-Disclosure Agreement.

D.E. 14, at 3 (quoting Compl., at ¶¶ 59-60).

11

The first allegation merely recites the desired legal conclusion—that Capricorn's Trade Secrets are trade secrets. It is not binding on the Court, need not be accepted as true, and should be accorded no weight. *Iqbal*, 556 U.S. at 678 ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

The second allegation is also largely conclusory—the trade secrets have not been disclosed improperly—but does imply the existence of a non-disclosure agreement. Contrary to the suggestion in Capricorn's pre-motion letter, the mere existence of a non-disclosure agreement does not alone establish the requisite secrecy. Rather, Maryland courts, again looking to the Restatement for "helpful guidance," consider a wider array of factors:

> Some factors to be considered in determining whether given information is one's trade secret are:
> 
> (1) the extent to which the information is known outside of his business;
> 
> (2) the extent to which it is known by employees and others involved in his business;
> 
> (3) the extent of measures taken by him to guard the secrecy of the information;
> 
> (4) the value of the information to him and to his competitors;
> 
> (5) the amount of effort or money expended by him in developing the information;
> 
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (1939). The Complaint is silent with respect to many of these considerations and pleads only sweeping and implausible conclusions with respect to others.

On the first factor, for example, Capricorn pleads that its trade secrets "are held in confidence by Capricorn as a company trade secret" but defines those trade secrets so broadly—"automation of the claims management process," "enhanced fraud detection," and "monitoring … efficiency," and "detection of abusive and/or fraudulent prescription[s]"—that it is facially implausible to suggest that no other insurance companies have developed such methods. *See Iqbal*, 556 U.S. at 678 (to survive dismissal a claim must be "plausible on its face").

With respect to the second factor, Capricorn pleads nothing regarding the extent to which its alleged trade secrets are known within Capricorn or within GEICO. Similarly, Capricorn does not allege any measures taken to guard the secrecy of its alleged trade secrets beyond the existence of a non-disclosure agreement. The Complaint is silent concerning even the most basic internal protections on access to its allegedly trade secret software (*e.g.*, where is the software source code kept and who has access to it?).

The remaining factors are similarly unavailing. Rather than assert that the alleged trade secrets are valuable to competitors, Capricorn pleads that the software in question was "customized … for GEICO." Compl., at ¶ 53. The Complaint is silent with respect to Capricorn's own expenditure of money in developing the trade secrets, perhaps not surprisingly since the software was developed by a Capricorn employee who sat in GEICO's Woodbury office and billed GEICO for time spent developing it. Lastly, given how broadly the alleged trade secrets are pled by Capricorn, it is implausible to suggest that they could not be duplicated, or have not already been duplicated, by other insurance companies.

Two conclusory allegations and the existence of a non-disclosure agreement are simply not enough to establish the "substantial element of secrecy" required for information to qualify for trade secret protection under MUTSA. Counts II and III should, therefore, be dismissed for

failing to pled a required statutory element, namely that information in question was "the subject of efforts reasonable under the circumstances to maintain its secrecy."

## IV. CONCLUSION

To survive a motion to dismiss, a claim must be plausible. Capricorn's suggestion that broad swaths of commonplace insurance industry software functionality, dictated by state regulations or developed by a third party, are protectable as its trade secrets is not. To the extent Capricorn intends to claim that only certain more specific elements of the Supercede software are its trade secrets, the Complaint fails to give GEICO the required "fair notice" of what those elements are. Counts II and III should be dismissed accordingly for failure to state a claim upon which relief may be granted.

Date: September 16, 2015

Respectfully submitted,

/s/ Clifford Thau

Clifford Thau, Esq.
Marisa Antos-Fallon, Esq.
**VINSON & ELKINS LLP**
666 Fifth Avenue, 26th Floor
New York, NY  10103
Tel:  (212) 237-0000
Fax:  (212) 237-0100
cthau@velaw.com
mantosfallon@velaw.com

Charles D. Ossola, Esq. (*pro hac vice*)
Matthew J. Ricciardi, Esq. (*pro hac vice*)
**VINSON & ELKINS LLP**
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC  20037
Tel:  (202) 639-6500
Fax:  (202) 639-6604
cossola@velaw.com
mricciardi@velaw.com

*Counsel for Government Employees Insurance Company*