FILED
CLERK

9/27/2016 2:52 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
CAPRICORN MANAGEMENT,         . Civil No. 15-CV-02926-DRH-SIL
                             .
          Vs.                .
                             .
                             . 100 Federal Plaza
                             . Central Islip, NY
GOVERNMENT EMPLOYEES INSURANCE.
et als.,                     .
                             . September 15, 2016
. . . . . . . . . . . . . . .
```

TRANSCRIPT OF STATUS CONFERENCE
BEFORE HONORABLE STEVEN I. LOCKE
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


For The Plaintiff:          COLLEN IP
                            By:  THOMAS PHILIP GULICK, ESQ.
                            80 South Highland Avenue
                            Ossining, NY  10562


For Defendant,              HUNTON & WILLIAMS LLP
                            By:  CHARLES DANIEL OSSOLA, ESQ.
                                 JOSEPH SALTARELLI, ESQ.
                            2200 Pennsylvania Avenue, NW
                            Washington, DC  20037


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

---

**TRACY GRIBBEN TRANSCRIPTION, LLC**
**859 Nutswamp Road**
**Red Bank, NJ 07701**
**(800) 603-6212**
**(732) 263-0044     Fax No. (732) 865-7179**
www.tgribbentranscription.com

2

1                           I N D E X

2

3    ORAL ARGUMENT                          PAGE

4    BY MR. OSSOLA                            4

5    BY MR. GULICK                           19

6

7    AGREEMENT                               33

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE CLERK:  Calling case 15-cv-2926, Capricorn

2    Management Systems Inc. versus Government Employees Insurance

3    Company.  Counsel, please state your appearance on the record.

4            MR. GULICK:  Tom Gulick (inaudible).

5            UNIDENTIFIED:  (inaudible)

6            THE COURT:  Okay.

7            MR. SALTARELLI:  Joseph Saltarelli, Hunton &

8    Williams.

9            MR. OSSOLA:  Your Honor, good morning, Charles Ossola

10   of Hunton & Williams in Washington, DC.

11           THE COURT:  Good morning.  Please be seated.  We are

12   here for motion hearing, it's docket entry 35, letter motion

13   for protective order by GEICO and there's opposition which I

14   understand pertains to two paragraphs in the proposed

15   protective order, is that correct?

16           MR. GULICK:  Yes, Your Honor.

17           MR. OSSOLA:  Yes, Your Honor.

18           THE COURT:  All right.  Who wants to make the first

19   pitch?

20           MR. OSSOLA:  Your Honor, we're the moving party if

21   GEICO may be allowed to do so.

22           THE COURT:  Absolutely.

23           MR. OSSOLA:  May it please the Court, Your Honor,

24   Charles Ossola for the defendant, GEICO.  Your Honor, this is a

25   breach of contract but more importantly it appears from the

1  discussions and the pleadings a software trade secret case.

2  And at issue is a nationwide claims management system that

3  GEICO developed with the assistance of a vendor over a period

4  of several years and at great expense that the plaintiff

5  alleges contains one or more of the plaintiff's trade secrets.

6          I should note that unfortunately at this stage of the

7  litigation, we do not know what trade secrets are actually at

8  issue in this litigation.  The complaint makes reference to

9  them.  We thought that identification was insufficient.  We

10  moved to dismiss.  That motion was denied.  But it was noted

11  that we would of course find out in discovery.  We have asked

12  in our first interrogatory for the plaintiff to identify the

13  trade secrets that we're actually fighting about.

14          That has not been responded to because of the

15  pendency of this dispute.  We answered the interrogatories

16  because there was no disagreement on other aspects of the

17  protective order.  The plaintiff chose not to do that which was

18  its prerogative.  But that's where we are today.  It is that I

19  stand before you on this motion without knowing what the

20  plaintiff's, what the issue really is here.  What trade secrets

21  we are actually talking about.  So that's point one.

22          Point two is, when it comes to the source code, the

23  basic language that sets forth what's going to happen and how

24  the programs are going to work which is sort of the Magna Carta

25  of proprietary systems.  The parties I think are in agreement,

Ossala/Argument                                                5

1   they are in agreement that source code inspection since that is

2   apparently where they contend the trade secrets have been

3   misappropriated, makes sense as a first step.

4          And Your Honor, I would go further.  I would say

5   depending on the outcome of the issues here, that once we know

6   what the trade secrets are, once we know what parts of the

7   source code they claim the trade secrets can be found in, that

8   one of two things may then happen.  First we may ask for leave

9   of court to file an early summary judgment motion because

10  there's no, in our view, there's no point in going to thousands

11  of emails, there are hundreds of people involved in this.  If

12  in fact there aren't any trade secrets that can be found in the

13  source code.

14         So there could be an early disposition by summary

15  judgment, we would come to the Court with that request or it

16  could be a possibility of settling the case once we know what's

17  actually at issue because so far there has been no evidence put

18  forward to us.  So in that context, source code inspection as

19  it's set forth in the protective order, draft protective order

20  we agree on the concept.  And we also agree that we will, we

21  GEICO will install and review computer for the plaintiff's

22  expert and plaintiff's counsel to come in and spend as much

23  time as they want.  We'll have our Atlas, that's the name of

24  the nationwide claim system program installed.

25         They will presumably install whatever version of

1  their software supersede which there are many versions of them.

2  We don't know which version they claim is the subject of this

3  action.  We'll install that.  And what's involved in review is

4  cases from this jurisdiction which we cite in the practices,

5  come in, conduct whatever searches you want to conduct if

6  you're the expert, we're agreed on that.  And then the whole

7  idea is to narrow and identify those portions of the source

8  code that are truly at issue.  You ask the plaintiff, you ask

9  the defendant to produce those portions of the source code and

10  it's done as a document production.  And that's the way this

11  ordinarily occurs.

12          Where we disagree is on two fronts, first volume.

13          THE COURT:  First what?

14          MR. OSSOLA:  Volume.

15          THE COURT:  Volume, okay.

16          MR. OSSOLA:  Customarily the whole idea is to use the

17  inspection as the opportunity to identify in most cases those

18  specific aspects of the source code that are at issue.

19          THE COURT:  Right.

20          MR. OSSOLA:  It's not a fishing expedition which we

21  believe is the way this is being set up with the plaintiff

22  requesting in its proposal, which it didn't address in this

23  letter by the way, that it be allowed to obtain 50 percent of

24  the 29,000 files.

25          THE COURT:  I don't see how either of you can pre-

1  designate what the right amount is.  What if the plaintiff

2  rings the bell and you've copied the entire code?  I'm not

3  saying that happened but what if they did?  Why is 50 pages

4  enough, why is 50 percent enough?  Don't you have to make this

5  application after the examination?

6              MR. OSSOLA:  Your Honor, that is certainly a way to

7  resolve this.  It has been actually discussed.  We don't know

8  what the scope is or what they're claiming.

9              THE COURT:  No, I get that part, I understand what

10 you're saying, I get it.

11             MR. OSSOLA:  So one way of doing this is what

12 actually the model order, we cited is it will be reasonable and

13 then the parties attempt based on the review to work out how

14 much source code is really needed.  My client is extremely

15 reluctant to turn over hundreds of thousands of files of source

16 code and produce that --

17             THE COURT:  But you're going to let them review it,

18 right, in this room?

19             MR. OSSOLA:  Absolutely.

20             THE COURT:  So then isn't it too early to say how

21 much of that code is relevant or should be produced?

22             MR. OSSOLA:  I think that's fair.

23             THE COURT:  Okay.

24             MR. OSSOLA:  I think that's fair and I think that

25 entering the protective order so we could proceed with this, --

1          THE COURT:  Well, if you're right and none of it is

2     the same then they should get none of it, but I don't know how

3     I could make a determination that makes any sense that's not

4     going to put you right back here six weeks from now with

5     someone making a motion.

6          MR. OSSOLA:  We're trying to avoid that which is why

7     we're here today.  And what we've proposed is in our experience

8     and what's most ordinarily done but you're right.  We don't

9     know how much is enough and they don't know how much is enough.

10          THE COURT:  Right, okay.

11          MR. OSSOLA:  But one aspect, so perhaps entering the

12     order was saying it would be a reasonable amount to be

13     determined by the parties and if necessary upon application to

14     the Court is the way to do that.

15          THE COURT:  Well, I think their expert will go in

16     there and say look, it's this much source code.  They'll tell

17     you first before it's turned over to whoever needs to see it

18     and you can challenge it or say you know I could challenge it

19     but we're going to lose and turn it all over pursuant to

20     whatever measures you think are sufficient to insure

21     confidentiality and do it that way, but okay, I cut you off.

22     I'm sorry.

23          MR. OSSOLA:  I understand what you're saying.  It

24     does make sense.  But there are two other aspects where we

25     disagree that I think are useful for the Court to understand.

1   They want to be able to, there isn't any issue about running

2   search terms and search, however many, I'll call them

3   intermediate search efforts while they have the software.  They

4   could take days and days, that's an inspection.  It may take

5   them three hours.  It may take them three days, no dispute

6   there.

7           They want the output, ultimately the output is our

8   source code that's at issue.

9           THE COURT:  Meaning whether it's 50 lines or 500,000

10  lines, okay.

11          MR. OSSOLA:  Right.  And they want that output to be

12  their work product.

13          THE COURT:  They're going to address that because I'm

14  not reading it the same way you are but go ahead.

15          MR. OSSOLA:  Okay.  Our understanding is, is that's

16  what they want.  And in our view absolutely cannot be their

17  work product.  It's our source code.

18          THE COURT:  Okay.

19          MR. OSSOLA:  We should know what's at issue.  We want

20  this.  If we agree, we produce this.  We mark it.

21          THE COURT:  Right.

22          MR. OSSOLA:  We produce it as any other document

23  production was done.  The expert and opposing counsel don't get

24  to walk out in the room with our source code, we have no idea

25  what they've taken, no idea which really at issue.  And that

Ossala/Argument                                        10

1  it's protected by work product which presents a great number of

2  problematic issues for GEICO down the road in this litigation

3  and other ones.

4              THE COURT:  Okay.

5              MR. OSSOLA:  So it's the output source code output is

6  our biggest concern that that be something that they make the

7  request, we consider the request if it's reasonable.  We've

8  been able to work together on other aspects of this.  We

9  produce it.  What they want to do though is whatever, and we

10 have no problem by the way, with the review software that they

11 are going to purchase and we're going to install.  That can be

12 deleted.  We know what it is.

13             THE COURT:  You mean their, that will delete just the

14 nature of their searches or their history, okay.

15             MR. OSSOLA:  Right.  We're not interested in their

16 search history.

17             THE COURT:  Okay.

18             MR. OSSOLA:  We're not interested in knowing or

19 wanting to know what that expert does in terms of this

20 analysis.

21             THE COURT:  Okay.

22             MR. OSSOLA:  Eventually he's going to have, he or she

23 is going to have to, if there's truly colorable similarities

24 that rise to the level of trade secrets and that they've been

25 misappropriated, they're going to have to identify those.

1          THE COURT:  I would think.

2          MR. OSSOLA:  But that's an expert discovery.  We

3    would hope that that would be done early here because given the

4    nature of this dispute, by the way the parties have a 30 plus

5    year business relationship until and unless we know what the

6    trade secrets are and what source code they want, we can

7    evaluate that, I think it could lead to an early disposition.

8          THE COURT:  Okay.

9          MR. OSSOLA:  Your Honor, the other aspect of it, to

10   the extent that the outcome contains some sort of remnant of

11   the search terms or search approach that the expert undertook,

12   our experience with this is that expert is going to be, he's

13   going to be at the review computer.  He can delete all that.

14   He can delete that --

15         THE COURT:  Your point is this is not a point of

16   contention, or this is --

17         MR. OSSOLA:  It shouldn't be.

18         THE COURT:  Okay.

19         MR. OSSOLA:  Because he does what he does.  He

20   deletes his intermediate steps.  We will delete the review

21   software.  And he will then identify, he or she, will identify

22   what it is that he thinks at issue.  We'll produce it.  That's

23   the way this is normally done.

24         THE COURT:  If you deleted this reviewing software,

25   would that delete the history with it or would the history

Ossala/Argument                                12

1  remain either way?

2          MR. OSSOLA:  The history should not, in our

3  experience it will not remain on the review computer because

4  the expert has the ability to delete his searches and whatever

5  steps he has taken as he proceeds.

6          THE COURT:  My question to you is slightly different

7  which is that there's this reviewing software.  If you use the

8  software and delete it in its entirety, would the history go

9  with that deletion or would the history remain unless

10 independently deleted?  You understand my question?

11         MR. OSSOLA:  I understand your question.  I'm not

12 sure I know the answer.

13         THE COURT:  Okay.

14         MR. OSSOLA:  But I know what the goal is, which is --

15         THE COURT:  Right, I'm trying to think of the fewest

16 number of steps you can do to achieve the goal, particularly

17 it's mutual.

18         MR. OSSOLA:  The goal is either the expert would

19 delete it which is our experience.

20         THE COURT:  Okay.

21         MR. OSSOLA:  Or it would otherwise be deleted but

22 we're not wanting to see his work, truly his work product.

23         THE COURT:  Right.

24         MR. OSSOLA:  The intermediate analyses but you know

25 again, we should be told what's at issue.

1              THE COURT:  Okay, I got it.

2              MR. OSSOLA:  And we'll produce it.

3              THE COURT:  Okay.

4              MR. OSSOLA:  Your Honor, and I say that also finally

5    because this is an inspection.  It is not a fishing expedition.

6    It is not gee we would like to go back and look at half of your

7    one billion bytes of source code.

8              THE COURT:  Well, they're going to look at all the

9    source code, aren't they?

10             MR. OSSOLA:  To look at it there but you don't get to

11   bring it home and, that's not an inspection.  That's just a

12   production of our software.  That's not what's normally,

13   customarily done.  It's not a source code inspection.  That's a

14   source code production.  And I think that's a key difference.

15             THE COURT:  Okay.

16             MR. OSSOLA:  So on the other issue that we disagree

17   on is whether or not two of GEICO's in-house counsel will have

18   access to highly confidential information.

19             THE COURT:  Okay.  Why do they need access?  You've

20   got a battery of competent lawyers already involved.  What do

21   they need it for?

22             MR. OSSOLA:  They need it for a couple reasons.  They

23   need it first to be able to manage this litigation from an in

24   house perspective.  Shelly Vaughn (phonetic) who is one of the

25   lawyers involved has day to day management responsibilities.

Ossala/Argument                                    14

1  We've put in declarations to say neither she nor John Shafner

2  (phonetic) --

3          THE COURT:  Well, what about Capricorn's person who's

4  responsible for managing litigation?

5          MR. OSSOLA:  They don't have such a person.

6          THE COURT:  They don't have an in house lawyer but

7  somebody has got to be in charge of it, right?  I would think.

8          MR. OSSOLA:  Not that I know of.

9          THE COURT:  So nobody is over seeing, you'll get a

10  chance to respond.

11          MR. OSSOLA:  I think the problem is there is no in

12  house counsel.

13          THE COURT:  I get that.

14          MR. OSSOLA:  If it's Dr. Silverstein (phonetic) he's

15  the owner of the business.

16          THE COURT:  Well, but my point to you is the argument

17  you're making doesn't that obtain to Capricorn as well?

18  Somebody has got to manage it from the in house perspective?

19          MR. OSSOLA:  Your Honor, I don't think so.

20          THE COURT:  Why?

21          MR. OSSOLA:  Because this is, first of all, you have

22  to look the cases discussed, lawyer by lawyer in the context of

23  the situation.  GEICO is a large corporation.  This is a trade

24  secret litigation involving one of its most important tools.

25  They have somebody responsible for managing and directing

1  outside counsel.  Plaintiff does not have a lawyer doing that.

2       THE COURT:  They don't have a lawyer doing it but

3  they must have somebody doing it.  I can't imagine nobody

4  oversees their outside counsel.

5       MR. OSSOLA:  I imagine they'll address that.  I would

6  hope so.  And John Shafner is responsible for making

7  recommendations to the general counsel about decisions to be

8  made in this litigation --

9       THE COURT:  Why can't Shelly Vaughn do that?  Why do

10 you need two people doing it?  I don't get that.

11      MR. OSSOLA:  The difference is this.  One is

12 responsible for day to day management, the other is in charge

13 of all intellectual property litigation, Mr. Shafner and has

14 the technology background.  Your Honor, if I may suggest --

15      THE COURT:  Ms. Vaughn must have the same technology

16 background or she wouldn't be able to do this, I assume.

17      MR. OSSOLA:  I'm sorry?

18      THE COURT:  Ms. Vaughn must have a similar bg or she

19 wouldn't be able to do this, would she?

20      MR. OSSOLA:  She does not have the technical

21 background that Mr. Shafner has nor does she have the

22 ultimately responsibility for intellectual property litigation

23 to Mr. Shafner.

24      THE COURT:  I'll tell you, I'm not sympathetic to a

25 chain of command argument giving their entire IP department

1   access to this.  So if you're going to pick one person, who is

2   it going to be?

3          MR. OSSOLA:  Your Honor, I would ask, I don't know

4   the answer because that's my client's decision.  If that's the

5   Court's decision, may I have leave to go back and ask my client

6   that question?  I don't have the answer.

7          THE COURT:  Well, we'll think about it.  I'm sorry,

8   it's Ms. Vaughn and Mr.?

9          MR. OSSOLA:  Mr. Shafner.

10          THE COURT:  Mr. Shafner, here it is.  Is he an

11   officer?

12          MR. OSSOLA:  He is.

13          THE COURT:  But he's not involved in any competitive

14   decision making, product decision making.

15          MR. OSSOLA:  He is not, none.

16          THE COURT:  Okay.

17          MR. OSSOLA:  And there's another aspect of our

18   proposal that the plaintiff did not address that I think in

19   terms of the factor of risk of inadvertence disclosure and harm

20   to the plaintiff, eliminates both of them.  That is we have

21   proposed in our version of the attorneys' eyes only that these

22   two people would not ever have a copy of plaintiff's highly

23   confidential material.

24          THE COURT:  I appreciate the effort that's involved

25   with that.  I'm not sure it gets you all the way there but I

Ossala/Argument                          17

1    understand the point.

2              MR. OSSOLA:  I mean we are talking about software.

3    So the risk that the IT department is going to come across this

4    in the general counsel's office, it's nonexistent under our

5    proposal.  They could come to our office.  We could show it to

6    them.  We can discuss it under our proposal.

7              THE COURT:  And you would only show it to the

8    lawyers.

9              MR. OSSOLA:  That's right.

10             THE COURT:  Nobody else.

11             MR. OSSOLA:  No one else, only the lawyers and the

12   lawyers don't leave with it and they'll never have an email

13   with it.  It will never be in their system.  They will never

14   have a copy of it.

15             THE COURT:  Okay.

16             MR. OSSOLA:  And that's a step beyond, that's a step

17   in the direction of trying to work this out.  But in terms of

18   the two points that the case law suggest are appropriately

19   considered, risk of inadvertent disclosure and potential harm

20   to the plaintiff.

21             THE COURT:  Right.

22             MR. OSSOLA:  Both are addressed by that point.  And I

23   should also just point out, Your Honor, the irony of this is

24   the plaintiff's software has been in my client's possession and

25   at various innovations over the years for many, many, many

Ossala/Argument                            18

1  years.  We don't know which parts of the software they claim to

2  be trade secrets.  But we already have it.  We just don't know

3  and the reason that it's so important that in-house counsel to

4  be able to be involved what exactly is the source code

5  comparison analysis, what does that yield if anything.  We

6  think nothing but we'll see.  And where does that leave us on

7  the merits?  Where does that leave us in terms of damages?

8          There are all sorts of decisions about the litigation

9  that will be based on that analysis which both of them from

10  GEICO's perspective need to be involved.  If we have to make a

11  choice, then we'll make a choice.  One is better than none.

12          THE COURT:  And I get that but that argument sounds

13  good when you say it fast, but you're certainly going to look

14  at the code and make whatever comparisons there are and you're

15  certainly able to make recommendations to GEICO about whether

16  hey, there's some merit here.  You better think about writing a

17  check?  Or there's no merit here.  Turn us loose.

18          MR. OSSOLA:  That is true.

19          THE COURT:  Without identifying the source code.  I

20  mean you're certainly able to do that.

21          MR. OSSOLA:  That is true, Your Honor, but I am not a

22  decision making for GEICO.

23          THE COURT:  No, they would have to rely on your

24  valuable counsel.

25          MR. OSSOLA:  True.  But in this context, at least the

1  case law does not just dismiss the notion that just because

2  it's in house counsel --

3            THE COURT:  True.

4            MR. OSSOLA:  -- you know it doesn't matter.  If

5  there's not a risk of inadvertent disclosure and there isn't

6  under our proposal we would submit, and there's no danger that

7  the trade secrets which we already have, we just don't know

8  what they are, --

9            THE COURT:  Right.

10           MR. OSSOLA:  -- would be disclosed to anyone else

11 then there's no basis in our view in law or in precedent for

12 denying the participation the access to the highly confidential

13 information on the limited terms that we've proposed.

14           THE COURT:  Okay.

15           MR. OSSOLA:  Your Honor, thank you very much.

16           THE COURT:  All right.

17           MR. OSSOLA:  And if we need to return to the subject,

18 of who, and you want me to answer that question, I will before

19 we leave.

20           THE COURT:  Good idea.

21           MR. OSSOLA:  I would rather ask my client but --

22           THE COURT:  Give it some thought.  Okay, who's going

23 to be speaking for the plaintiffs?

24           MR. GULICK:  Tom Gulick.

25           THE COURT:  Mr. Gulick, a couple things I would like

1  you to address.  First of all this notion that they don't know

2  what the trade secret is.  I would like you to tell me why you

3  think there has been some kind of violation of your client's

4  rights?  I'm not going to rule on that, I just want to

5  understand the nature of the case.

6          MR. GULICK:  I understand.  There are portions of the

7  particular software code that our company or the plaintiff has

8  that are not known in the industry --

9          THE COURT:  Right.

10         MR. GULICK:  -- and they do provide a substantial

11 advantage to whoever has them and uses them.

12         THE COURT:  No, I get the value of the code.  Why do

13 you think that GEICO has taken it in violation of some

14 agreement of yours?

15         MR. GULICK:  Because we have contractual agreements

16 with GEICO, a non --

17         THE COURT:  But how do you know they violated the

18 agreements?

19         MR. GULICK:  Hmm?

20         THE COURT:  Why do you think they violated the

21 agreements?  What's the basis of your belief?

22         MR. GULICK:  Two, nondisclosure for the fact that

23 they've disclosed it to vendors to be able to build this for

24 their larger nationwide purpose.

25         THE COURT:  How do you know they used it in their

1  larger nation, I read the complaint.

2           MR. GULICK:  Yes.

3           THE COURT:  How do you know they used it on a

4  nationwide basis as opposed to just in New York or why do you

5  think that?

6           MR. GULICK:  Well, one of the pieces of evidence

7  that's pretty relevant is the complaint in New Jersey that's

8  filed based on what they call NCV or nerve conduction fraud.

9           THE COURT:  Okay, so you think they used it in New

10  Jersey based on the nature of that claim.

11           MR. GULICK:  Yes.

12           THE COURT:  Okay.  What's the other?  You said there

13  were two.

14           MR. GULICK:  Sorry.  So the second one is, that's for

15  what I'll call the royalty contract.

16           THE COURT:  Right.

17           MR. GULICK:  There's a contract for the specific

18  software.  There's also a nondisclosure agreement involved and

19  which we believe they've shared that information with other

20  parties in order to develop this particular software.

21           THE COURT:  Again, based on the New Jersey complaints

22  or something else.

23           MR. GULICK:  No, it could be based, there's a

24  separate contract that says they can't disclose --

25           THE COURT:  I get that, but why do you think that

1   separate contract was violated?  Something must have tipped

2   your client into filing this lawsuit.  They must have gotten

3   wind of something.

4                    MR. GULICK:  Well, --

5                    THE COURT:  Besides the New Jersey claim, what was

6   that wind?

7                    MR. GULICK:  The information that they had received

8   at least in part from their employee who works inside, worked

9   inside at GEICO's offices who was encouraged to I'll say aid or

10  assist them with some of the efforts that were involved.

11                   THE COURT:  Okay.  Let's talk about the arguments at

12  issue then.

13                   MR. GULICK:  Okay.  I would like to start actually

14  with the paragraph 6 which involves the source code and I just

15  have a couple of points to make on that.  One of them is

16  they're picking what I would call the most restrictive means

17  possible and I understand that we're dealing with a trade

18  secret when we're dealing with software but to the extent that

19  obviously we've already discussed that volume maybe a separate

20  issue.  But to the extent that we're dealing with billions of

21  bytes of data which you know at the beginning we didn't know

22  exactly how much we were dealing with.

23                   The software that we employed to compare some of this

24  material is going to be very important and I would call a time

25  saving function.  And to the extent that we're going to utilize

1  and maximize those particular things, you know counsel had

2  mentioned before they can spend as much time in there as they

3  want.  Well, this sort of mechanism seems to make us spend as

4  much time there as possible.

5         THE COURT:  I just want to, understanding you

6  correctly.  The way this will likely work, given the size of

7  the code, as you have a program that essentially is like the

8  Compare Write (phonetic) in Microsoft Word and you're going to

9  compare the two codes and see what overlaps.  Is that the gist?

10        MR. GULICK:  Yeah, it's a little more complicated.

11 There's some translation and things like that involved but,

12 yes.

13        THE COURT:  Will the computer program do that for you

14 or does an expert have to visually look at it and do it?

15        MR. GULICK:  No, the computer program will do some of

16 that translation.

17        THE COURT:  Okay, so it's a very elaborate form of

18 doing it.

19        MR. GULICK:  Yes.

20        THE COURT:  Okay.  So I mean, am I correct to

21 understand then whatever program you use, you plug them into

22 either one or two computers.  You hit some kind of switch and

23 then you wait.  And then the expert will look at what the

24 result is.  I assume some of it will be not so useful and some

25 of it might be very useful.

1              MR. GULICK:  Exactly, yes.

2              THE COURT:  Okay.

3              MR. GULICK:  So what we're saying is for those parts

4     that would be particularly useful, the only mechanism we have

5     to use is our handwritten notes based on GEICO's proposal.

6              THE COURT:  No, the mechanism is the program ,the

7     notes is how you record it.

8              MR. GULICK:  The notes are how we record it, but we

9     can't even record what, or verbatim copy under their particular

10    plan.

11             THE COURT:  Other than 50 pages of 25 lines each.

12             MR. GULICK:  Well, no, handwritten notes, there's no

13    verbatim coy allowed.

14             THE COURT:  No, but you said in terms of the actual

15    code, their proposal.

16             MR. GULICK:  In terms of the actual code, the volume

17    would be 50 pages or 25 consecutive lines of code which in the

18    big scheme of a billion bytes of data would be --

19             THE COURT:  50 pages of 25 lines each is the

20    proposal.

21             MR. GULICK:  No, 50 pages total but no more than 25

22    consecutive lines of code can be taken.

23             THE COURT:  So lines of code can be long.

24             MR. GULICK:  I wouldn't consider it very, think of it

25    as page line, 25 consecutive lines of a particular code.

1          THE COURT:  Okay.  All right.

2          MR. GULICK:  Which in the big scheme of things for a

3  billion bytes of data would be well under probably even half or

4  a quarter of a percent.

5          THE COURT:  Okay, that's fine.

6          MR. GULICK:  And I can tell you, the plaintiffs can

7  tell you we don't want to take more than we need.  That's not

8  the purpose or intent.  It's not meant to fish.  It's meant to

9  if there's that much we need to take what we need.  We're not

10  looking to take 100 percent because we can take 100 percent.

11  That's not the purpose of this.  So that's why those were

12  important steps.  And what we would like in writing in the

13  protective order is a mechanism to make sure that the materials

14  are deleted one way or the other.  You can see --

15          THE COURT:  Are deleted.

16          MR. GULICK:  In other words, the software comparison,

17  either the software is deleted or our searches are fully

18  deleted.  I believe it would be easier to have the software

19  deleted.

20          THE COURT:  Okay.  Let me just make sure I understand

21  you because it looks like Mr. Ossola was correct in his

22  understanding of what you're asking for.  Let's say you run

23  this program and your expert looks it over and there's 200,000

24  lines that you think all right, this is our stuff.

25          MR. GULICK:  Yes.

1          THE COURT:  You want to delete, after you've decided

2    which 200,000 lines they are, you want to delete those 200,000

3    lines?

4          MR. GULICK:  We want the software deleted from the

5    review computer that will be in their possession.

6          THE COURT:  Well, how are they supposed to know which

7    lines you're focusing on if you delete the software?  Do you

8    mean the review software or the actual software with the code

9    that's at issue?

10         MR. GULICK:  No, sorry.  So the software that's doing

11   the comparison itself.

12         THE COURT:  Should be deleted.

13         MR. GULICK:  Should be deleted so that --

14         THE COURT:  Okay, well, I don't think, Mr. Ossola,

15   you don't care about that.  Isn't that what you said?

16         MR. OSSOLA:  No, Your Honor.

17         THE COURT:  Okay.  So that's fine.

18         MR. GULICK:  Well, that's something we want in

19   writing in the form of the protective order.

20         THE COURT:  Okay.  We'll get to that, the writing

21   part, okay.  The next issue.  What about, go back to my

22   original question.  You run this review.  Your expert reviews

23   the review of the computer program and you find 200,000 lines

24   of code that you need for your case.

25         MR. GULICK:  Yes.

Gulick/Argument                        27

1           THE COURT:  Are you then going to disclose, it has

2    now gone from a billion, whatever it is to 200,000 lines.

3    You're going to identify those 200,000 lines to your adversary?

4           MR. GULICK:  We're going to ask them to produce them

5    as document production.

6           THE COURT:  Everybody knows what part of the code is

7    at issue now, right?

8           MR. GULICK:  Yeah.

9           THE COURT:  Okay.

10          MR. GULICK:  Within the realm of --

11          THE COURT:  So that's contrary to what you were

12   saying, Mr. Ossola, right?  You don't have to stand up.

13          MR. OSSOLA:  Not quite.

14          THE COURT:  Okay, what --

15          MR. OSSOLA:  That is indeed the end result of the

16   source code --

17          THE COURT:  Right, but originally you said your

18   concern was that they're trying to hide the ball, that they're

19   going to figure out what it is at issue here and then get rid

20   of it so that you don't even know what is allegedly

21   misappropriated.

22          MR. OSSOLA:  That's what their proposal says.

23          THE COURT:  Okay.  But now I'm asking Mr. Gulick is

24   that what you're saying now?

25          MR. GULICK:  What I'm proposing is whatever we take,

1  in other words we want produced, we will tell them this is the

2  material we want produced.

3           THE COURT:  Okay, so there you go.

4           MR. OSSOLA:  There we are.

5           THE COURT:  Okay.  Thank you.  All right, Mr. Gulick,

6  continue.

7           MR. GULICK:  Okay.  As to, I can say that we're

8  willing to work with them and be reasonable in terms of the

9  amount as the amount comes out once the inspection is done.  At

10 the same time, we couldn't agree to the --

11          THE COURT:  Well, what do you think about my thought

12 about saying first, conduct the review.  Your expert and the

13 lawyers there will who is ever with them will decide here's

14 what we think we need.  Whatever fraction of the total code

15 that is.  Advise Mr. Ossola, he'll preserve, he's under a duty

16 to preserve whatever you identify.  Tell Mr. Ossola so that he

17 can review it and he may come to the conclusion you know what,

18 this is more than the 50 pages I thought but I get the argument

19 or more importantly, if I take it back to the Judge, I think

20 I'm going to lose and just give it to you.  Why can't we do it

21 that way?

22          MR. GULICK:  I don't really take an issue with that.

23 I think it's more, you know this is how their protective order

24 version --

25          THE COURT:  No, I get it but you know this is a

1  dynamic process.

2          MR. GULICK:  No, that's fine.  I think that's

3  something we can live with, yes.

4          THE COURT:  Okay.  All right, continue.

5          MR. GULICK:  Okay.  And then onto the second point

6  with the in-house counsel.  I think you probably went right to

7  the point.  It's fundamental fairness if the in-house counsel -

8  -

9          THE COURT:  That was how I was prodding him.  I am

10 very uncomfortable with giving this information to an in-house

11 person who's not a lawyer.  I take the representations of

12 lawyers very seriously and if Mr. Shafner has no record of

13 extreporous conduct with any court and he says I'm not going to

14 tell anybody and I'm not a decision maker, I'm inclined to take

15 him at his word.

16         MR. GULICK:  No, and I don't mean to besmirch them in

17 any way.

18         THE COURT:  No, I'm not taking it that way.

19         MR. GULICK:  All I'm trying to say is you know from

20 the perspective of they've put forth the reason why is to

21 evaluate the claims.  Well, that's not really a sufficient

22 reason to be able to give them this highly confidential

23 information.  And I find that to be a weakened argument

24 especially in light of the fact that if they're looking for

25 instructions, they have outside counsel who is going to be

Gulick/Argument                                      30

1  doing all of this for them.  There's nothing put forth in this

2  declaration.

3          THE COURT:  Doesn't the law say you shouldn't divide,

4  make a distinction between the in-house and outside counsel?

5          MR. GULICK:  There is that distinction.  However, at

6  the same time there's another distinction to make there because

7  these in-house people are working in-house and to the extent

8  that there's an inadvertent disclosure, it could come from the

9  very nature of their position itself in the fact that they know

10  all this information and it's there.  It's within their store

11  house of knowledge.  And to that extent, we don't see from

12  these declarations other than from Mr. Shafner who does say

13  that he's I believe a secretary and assistant --

14          THE COURT:  Assistant secretary.

15          MR. GULICK:  Assistant secretary and a vice

16  president.

17          THE COURT:  Assistant vice president.

18          MR. GULICK:  There is a role there where he will have

19  to talk with those competitive decision makers.

20          THE COURT:  But you're deducing that just based on

21  his title, aren't you?

22          MR. GULICK:  Well, I have nothing more to base it off

23  of.

24          THE COURT:  I'm not, you know trying to hammer down

25  on you.

1          MR. GULICK:  I understand.

2          THE COURT:  You may have more information, I don't

3   know.

4          MR. GULICK:  I don't have any additional information.

5   At the same time, you know the declaration says what it says.

6          THE COURT:  I mean it could also be that everybody in

7   the general counsel's office is an assistant vice president.  I

8   mean financial institutions are funny that way.

9          MR. GULICK:  I don't want to speculate one way or the

10  other but I'm saying the potential is there with an in-house

11  that wouldn't be present --

12         THE COURT:  The potential is always going to be

13  there.  I get it.

14         MR. GULICK:  -- with the outside counsel.

15         THE COURT:  I get it, okay.  What else?  There is

16  some more detail things.  For example, the reviewing computer

17  is going to be at an outside vendor as opposed to counsel's

18  office and that kind of thing.

19         MR. GULICK:  Well, that's something, I don't

20  particularly, you know have a preference of where it would

21  necessarily be held.  That was based on prior conversations

22  that were held if it's at their office, if it's somewhere else.

23  We can come to an agreement on where that will be.

24         THE COURT:  Okay.  Go ahead, continue.

25         MR. GULICK:  I think that that covers the points that

Agreement                                    32

1  I wanted to make about these particular issues.

2            THE COURT:  Okay.  There are two ways we can go.  You

3  can sit down.  You don't have to keep standing.  I can give you

4  a ruling about what I think how this should go forward at this

5  point or I can send you outside for 30 minutes and we can have

6  baseball arbitration and you can each give each other your last

7  best offer based on what I've said so far.  What do you think?

8            MR. GULICK:  I'm open to a discussion.

9            THE COURT:  Is your mic on?

10            MR. GULICK:  Sorry.

11            THE COURT:  That's all right.

12            MR. GULICK:  I'm open to discussion.  I mean it

13  doesn't hurt to talk if that's something we're --

14            THE COURT:  I'll give you 30 minutes.  You can come

15  back and either you'll have to solve it or I'll give you a

16  ruling and either way we'll walk out of here moving the ball

17  forward.

18            MR. OSSOLA:  Agreed, Your Honor.

19            THE COURT:  Okay, 30 minutes.

20                  (Recording paused @ 11:38:27 a.m.)

21                  (Recording resumed @ 12:00:10 p.m.)

22            THE CLERK:  Recalling case 15-cv-2926, Capricorn

23  Management Systems versus GEICO.

24            THE COURT:  Have a seat.  Okay, have we resolved

25  anything?

Agreement                                   33

1            MR. OSSOLA:  We have.

2            THE COURT:  Anything or everything?

3            MR. OSSOLA:  Not everything but --

4            MR. GULICK:  Most things.

5            MR. OSSOLA:  -- along the lines that you suggested.

6  First, on the source code review inspection, I think we've

7  agreed that you know what we're interested in is ultimately the

8  output of the source code, the inspection is going to be, we're

9  not going to impede or be involved in it.  We can work out the

10 language.

11           THE COURT:  Okay.

12           MR. GULICK:  Between the both.

13           MR. OSSOLA:  We can work out the language to present

14 to Your Honor.

15           THE COURT:  So this is paragraph 6.

16           MR. GULICK:  For paragraph 6, yes.

17           THE COURT:  Okay.

18           MR. OSSOLA:  So we think that's going to work.  With

19 something like reasonable because as you stated from the bench,

20 this would be without prejudice to us coming back for us to see

21 is this reasonable, and if we think it's unreasonable, we would

22 come back to the Court.  But only --

23           THE COURT:  Okay.

24           MR. GULICK:  Obviously it cuts both ways.

25           THE COURT:  Right, no, I think either of you can make

Agreement                                     34

1   a motion.

2             MR. GULICK:  Absolutely.

3             THE COURT:  Discovery motion regarding the scope.

4             MR. OSSOLA:  We would hope and expect to work closely

5   to try to avoid that.

6             THE COURT:  Okay.  I think that's a good idea because

7   I'm not, the size of what's produced has no impact on my

8   thinking whatsoever.  It's just a question of relevance.  And

9   to the degree I can't understand anything that you're talking

10  about with respect to the code, we're going to have to have a

11  hearing to figure it out which I think would be a pain in the

12  neck for everybody.

13            MR. GULICK:  Yes.

14            THE COURT:  So okay, paragraph 6, tell me about

15  paragraph 7(b).

16            MR. OSSOLA:  We've reached agreement on the two GEICO

17  individual house counsel, Mr. Shafner and Ms. Vaughn being able

18  to see highly confidential information in our offices, in

19  Hunton Williams offices --

20            THE COURT:  Which is what you proposed.

21            MR. OSSOLA:  I'm not sure --

22            MR. GULICK:  I think we have to modif a little bit of

23  the language on how that works.

24            THE COURT:  Okay.

25

1            MR. GULICK:  But yes, we're there.

2            MR. OSSOLA:  The concept that they will not have a

3  copy, they will come and look at it --

4            THE COURT:  Right.

5            MR. OSSOLA:  -- and can have access to it only in

6  that sense, we're agreed on that, both of them.

7            THE COURT:  Okay.  So is there anything else?

8            MR. OSSOLA:  There isn't.

9            THE COURT:  Okay.  I neglected to say that Mr.

10 Shoenstein was an adversary of mine at some point where he

11 shived (phonetic) me pretty good in a case up in White Plains.

12 That will not impact anything going forward with this case but

13 to the degree anybody wants to make a record, go ahead.  Okay,

14 I'll take your silence as assent.  Is there anything else we

15 need to talk about?

16           MR. OSSOLA:  No.

17           MR. GULICK:  Yeah, just briefly.  I mean we've gone

18 through sort of the mechanisms and all the issues with

19 discovery thus far and you know to this point, I don't know

20 where necessarily the settlement negotiations or talk has gone.

21 I don't know how necessarily defendant feels about it but we

22 would be open to some sort of court mediation or settlement

23 dialogue or discussion.

24           THE COURT:  Okay, we can do that either one of two

25 ways.  One is I'm happy to hold a settlement conference and if

1  you look at my individual rules they're pretty clear.  What you

2  need is somebody here from both companies.  Nobody gets to

3  report in by phone.  Nobody takes that seriously.  Other than

4  that, we can do it.  It seems to me Mr. Ossola, what you're

5  saying is let's see what the scope of this is before I show up

6  for a settlement conference.  Is that sound right?

7          MR. OSSOLA:  I would refine it a little bit, Your

8  Honor.  But basically that's right.

9          THE COURT:  Okay.

10          MR. OSSOLA:  First we would need to know what the

11  trade secrets are.  We do not know.

12          THE COURT:  Okay.

13          MR. OSSOLA:  Secondly, we need to know where in our

14  source code they claim the issues are.  If once we know that,

15  then we're perfectly amenable to a settlement conference.

16          THE COURT:  Look, my feeling is settlement

17  conferences are voluntarily.  I'm not going to make anybody

18  come or twist their arm because then we just all waste a lot of

19  time.  But that's fine.  We can certainly do something like

20  that going forward.  The other option is the Eastern District

21  maintains a panel of mediators with specialized knowledge.  I

22  assume there is a panel of IP mediators.  If you want a refer

23  order for that, I'll give it to you.

24          MR. GULICK:  Okay.

25          THE COURT:  Up to you, all right.

1          MR. OSSOLA:  Your Honor, there is one other issue

2    that, which just came to mind and I think it ties in with the

3    efficiency of doing the source code review.  Seeing what we

4    have --

5          THE COURT:  Right.

6          MR. OSSOLA:  -- and perhaps having the settlement

7    conference, we would like to defer further document discovery

8    and review of thousands of emails and production emails until

9    we know what the case is about.  It's an enormous expense for

10   my client to proceed to respond to the request for the

11   production of documents of all these documents from hundreds of

12   people.

13         THE COURT:  What if you fired the gecko?  Would that

14   save all the money you need to pay for the litigation?  Would

15   that do it?

16         MR. OSSOLA:  I'm not allowed to speak ill of the

17   gecko, Your Honor.

18         THE COURT:  Okay.

19         MR. OSSOLA:  But I think we're agreed that we need to

20   do this as soon as possible.

21         THE COURT:  I agree.  I ordinarily will not do that

22   but if you make a representation to me that you'll get this

23   together and done, then what I would say, suggest to do it then

24   you can submit a revised scheduling order and I'll take a look

25   at it but I want you to agree on that.

1          MR. GULICK:  That's something --

2          MR. OSSOLA:  And I haven't discussed it with Mr.

3  Gulick so I apologize for just bringing it but it did come to

4  mind that some day if we're going to do this and we've agreed

5  on it, let's do it and see where we are before --

6          THE COURT:  Well, how long will it take to get this

7  done, to get it set up and then you to get ready with your

8  expert and all that, what's a reasonable estimate?

9          MR. GULICK:  I don't want to venture a specific

10  guess, because like I said, volume and size --

11          THE COURT:  I'm not going to hold you to it,

12  approximately.

13          MR. GULICK:  I'm hoping --

14          THE COURT:  If you tell me a year, that would be too

15  long.

16          MR. GULICK:  Two years.

17          MR. SCHOENSTEIN:  Judge, if I may, I apologize

18  because I know I'm new to the case but two things.  One, the

19  fact that I'm new to the case and getting involved and need a

20  little bit of get involved time.  I would say the expert part

21  would take a couple months.  The other thing I would say from

22  my perspective is, let's not pretend this case is only about

23  the source code and that if there's not a hit in the source

24  code, the case is over because I don't believe that's true at

25  all.

1          THE COURT:  Okay.

2          MR. SCHOENSTEIN:  So to stall the rest of discovery

3  is a little bit hide the ball to me and I don't think we should

4  go down that path.

5          THE COURT:  Okay.

6          MR. OSSOLA:  Well, Your Honor, if this is something

7  about something other than source code, we don't know what it's

8  about.  So we don't know what it is that they're pointing to.

9  But reviewing and producing thousands of emails related to the

10  Atlas development, implementation, roll out, we're talking

11  hundreds of thousands emails.

12          THE COURT:  Okay, Mr. Schoenstein, what else is this

13  case about?

14          MR. SCHOENSTEIN:  Well, Your Honor, the complaint is

15  about misappropriation of trade secrets.  It's about breach of

16  contract and --

17          THE COURT:  But isn't the secret and the breach all

18  revolve around the use of this code or is there something else?

19          MR. SCHOENSTEIN:  I don't know that it all involves

20  argument the use of the code.  Again, Your Honor, my feet are

21  only a little bit now.

22          THE COURT:  That's the problem.  You're kind of

23  speaking out of both sides of your mouth, aren't you?  I don't

24  know but I want to reserve my rights.

25          MR. SCHOENSTEIN:  But that's my point.  I don't want

Agreement                    40

1  to agree right now that we're going to do this source code

2  thing and table all over discovery.

3            THE COURT:  No, you're not giving up any rights about

4  this.  I'm just trying to prepare a timetable.

5            MR. SCHOENSTEIN:  I mean obviously if there are

6  overbroad discovery requests that go beyond the allegations of

7  the complaint they're going to object and not produce anything

8  and force us to fight in discovery.  That's the way it always

9  works.

10           THE COURT:  Okay.  I get it.  Anything else?

11           MR. SCHOENSTEIN:  No.

12           MR. OSSOLA:  Your Honor, he's asking for discovery to

13 continue --

14           THE COURT:  Your application for a 60 day stay of

15 everything else is granted.

16           MR. OSSOLA:  Thank you.

17           THE COURT:  All right.  You want another status

18 conference?

19           MR. OSSOLA:  Yes.  Your Honor, may I respond to the

20 timing issue?  A couple of months --

21           THE COURT:  What timing, okay, yes.

22           MR. OSSOLA:  The couple of months' estimate I was

23 surprised to hear.  I was thinking this is a matter of weeks,

24 not months.

25           THE COURT:  Okay.

1          MR. OSSOLA:  We're able to move much quickly than a

2    couple months.

3          THE COURT:  Okay.  60 days seems long to me but I'm

4    still going to allow for that.  It's not an impossibly long

5    amount of time.  So what I would like you to do is you've got

6    60 days to get this together.  If you cant' do it in 60 days,

7    you've got to tell me why and tell me when it's going to be

8    done because 60 days is certainly long enough time to figure it

9    out.  The other thing is considering that, put together an

10   agreed upon revised scheduling order and then we'll have you

11   back in 90 days.  I would like to see the draft order though

12   before you come back.

13         MR. OSSOLA:  Yes, Your Honor.

14         THE COURT:  And give them a good chunk of time,

15   please.

16         THE CLERK:  December 19th.

17         THE COURT:  December 19th at two o'clock, are you all

18   available?

19         MR. OSSOLA:  Your Honor, one moment.  I'm showing my

20   age by looking at a written calendar.

21         THE COURT:  You are.

22         MR. GULICK:  December 19.

23         THE COURT:  At two.  This will be on ECF so if you

24   don't get it all down.

25         MR. OSSOLA:  It's fine with us, Your Honor.

Agreement                                    42

1          THE COURT:  Okay.  Anything else from the plaintiff,

2     Mr. Gulick?

3          MR. GULICK:  No.

4          THE COURT:  For the defense, Mr. Ossola, am I saying

5     it right?

6          MR. OSSOLA:  Ossola.

7          THE COURT:  Ossola, apologies.

8          MR. OSSOLA:  In Italy it's Ossola.

9          THE COURT:  I can't speak Italian.  Okay, very good.

10    thank you all.  We are concluded.  I'll look for your proposed

11    order on ECF.

12         MR. OSSOLA:  Thank you, Your Honor.

13         MR. GULICK:  Thank you, Your Honor.

14                         * * * * *

15                   **C E R T I F I C A T I O N**

16         I, Tracy Gribben, court approved transcriber, certify

17    that the foregoing is a correct transcript from the official

18    digital audio recording of the proceedings in the

19    above-entitled matter.

20

21    /s/ ***TRACY GRIBBEN***                     143

22                                        AOC Number

23    TRACY GRIBBEN TRANSCRIPTION LLC  September 26, 2016

24

25