IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
CENTRAL ISLIP DIVISION

CAPRICORN MANAGEMENT
SYSTEMS, INC.

        *Plaintiff,*

    *v.*

GOVERNMENT EMPLOYEES
INSURANCE COMPANY *and*
AUTO INJURY SOLUTIONS, INC.

        *Defendants,*

    *v.*

CHARLES M. SILBERSTEIN

        *Counterclaim-Defendant.*

Case No.  2:15-cv-02926-DRH-SIL

**GEICO'S OBJECTIONS TO THE MAGISTRATE'S
ORDER, REPORT & RECOMMENDATION
PURSUANT TO FED. R. CIV. P. 72(b)(2)**

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................................1

II.   APPLICABLE LAW ...................................................................................................3

III.  OBJECTION TO SECTION III(C)(i) OF THE REPORT ..........................................4

    A.    GEICO's nationwide ATLAS claims management system
        never included NCV fraud detection functionality....................................5

    B.    GEICO never used Encovel outside of New York ...................................6

    C.    A GEICO employee with no access to Encovel independently
        developed a database to check for duplicate NCV test results
        outside of New York...................................................................................6

        i.    Mr. Brady never used Encovel and based his database
            on example NCV test reports, the "Microsoft Access Bible"
            self-help book, and online programming forums ..........................6

        ii.   The Report never mentions Mr. Brady's testimony
            or cites any evidence to contradict it ...........................................8

        iii.  Capricorn's scattershot opposition relies on factual
            misrepresentations and speculation ............................................10

IV.   OBJECTION TO SECTION III(B)(ii) OF THE REPORT ...........................................13

    A.    "Capricorn's actions, or lack thereof, demonstrate an
        intent to deprive Defendants of information." .........................................13

    B.    An adverse inference is expressly authorized by
        FED. R. CIV. P. 37(e)(2) and warranted here...........................................15

    C.    Defendants were prejudiced by Capricorn's intentional misconduct....................17

V.    CONCLUSION............................................................................................................18

# TABLE OF AUTHORITIES

<u>Statute</u>                                                                                                           <u>Page</u>

28 U.S.C. § 636......................................................................................................................3


<u>Rule</u>                                                                                                             <u>Page(s)</u>

FED. R. CIV. P. 37..........................................................................................................2, 15–18

FED. R. CIV. P. 72...........................................................................................................1, 3, 20


<u>Case</u>                                                                                                             <u>Page</u>

*Gutman v. Klein*,
    2010 WL 4916722 (E.D.N.Y. 2010) ................................................................3

*Haynes v. Quality Markets*,
    2003 WL 23610575 (E.D.N.Y. 2003) ..............................................................3

*Kronisch v. U.S.*,
    150 F.3d 112 (2d Cir. 1998) ...........................................................................17

*Mulberry Homes VI, LLC v. Gargiulo*,
    2016 WL 5409244 (E.D.N.Y. 2016) ................................................................3

*NCA Investors Liquidated Trust v. Dimenna*,
    2019 WL 2720746 (D. Conn. 2019)................................................................17

*Resnik v. Coulson*,
    2019 WL 1434051 (E.D.N.Y. 2019) ..............................................................13

*Scentsational Techs., LLC v. Pepsico, Inc.*,
    2018 WL 2465370 (S.D.N.Y. 2018)...............................................................13

*Ungar v. City of New York*,
    329 F.R.D. 8 (E.D.N.Y. 2018)........................................................................18

*United States v. Raddatz*,
    447 U.S. 667 (1980).........................................................................................3

*West v. Goodyear Tire & Rubber Co.*,
    167 F.3d 776 (2d Cir. 1999) ...........................................................................14

## I.    INTRODUCTION

Pursuant to Fed. R. Civ. P. 72(b)(2), defendant Government Employees Insurance Company ("GEICO")[1] hereby respectfully objects to the Magistrate's Order, Report & Recommendation ("Report"), docket no. 127, in two respects:

First, GEICO objects to Section III(C)(i) insofar as it recommends that "Defendants' motion for summary judgment on Count I of the Amended Complaint, docket no. 55, be denied" because, the Magistrate concluded, there exists a genuine issue of fact as to "whether GEICO used its own NCV database or Capricorn's Encovel Detection Module" to detect fraud outside of New York.[2]  As discussed below, there is simply no *evidence* in the record that GEICO used the Encovel Detection Module[3] outside of New York, and unsubstantiated allegations and suspicions cannot carry the day at this stage.  The record evidence establishes that GEICO used only a rudimentary Microsoft Access database, which was developed internally by an employee who never used Encovel and had no access to its source code, to check for duplicate NCV test results outside of New York.  GEICO is, therefore, entitled to summary judgment on Count I and dismissal of the Amended Complaint in its entirety.

---

[1] The Report recommends granting summary judgment in favor of Auto Injury Solutions, Inc. ("AIS") and against plaintiff Capricorn Management Systems, Inc. ("Capricorn") on all claims asserted against AIS.  Because this objection relates principally to Count I of the Amended Complaint, which is directed against GEICO only, AIS does not join this objection.

[2] "NCV" is an acronym for Nerve Conduction Velocity, a medical diagnostic test that measures the rate at which electrical impulses propagate through nerves in the human body.  NCV testing may be performed after an automobile accident, for example, to assess possible nerve damage.  Timing values on two NCV test reports should never be exactly the same, even when the test is repeatedly administered to the same patient, so identical test results can be an indicator of fraud.  *See* Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment ("SOF"), docket no. 107-2, at ¶¶ 25–29.

[3] Capricorn dubbed its NCV fraud detection database the "Encovel Detection Module," a portmanteau of Electronic Nerve COnduction VELocity.  *See* Amended Complaint ¶ 30.

Second, GEICO objects to Section III(B)(ii) insofar as the Magistrate found (correctly) that Capricorn *intentionally* destroyed evidence but nevertheless declined to sanction Capricorn because he found (incorrectly) that "Defendants have failed to show that the lost information was important or how they are prejudiced by such loss." Report at 31–34. The evidence in question consists of "the DePace Gmail account," among other things.[4] *Id.* at 27–29. The few e-mail messages between Mr. DePace and Dr. Silberstein that Defendants recovered from other sources directly undermine Capricorn's case and, with due respect to the Magistrate, could not be more important. *See, e.g.,* SOF ¶¶ 57 ("Since [GEICO is] not using Visual Basic, they cannot be copying [Capricorn's] code.") and 60 ("After reviewing this document, I find no duplication of [Capricorn's] processes.").

Capricorn's intentional failure to preserve Mr. DePace's Gmail account, and the e-mails of a dozen other custodians, prejudices Defendants because it is reasonable to believe those lost e-mails would contain more similarly frank internal assessments against Capricorn's interest, which Defendants are now deprived of using to defend themselves. *See* Memorandum of Law in Support of Defendants' Motion for Sanctions Under FED. R. CIV. P. 37(e)(2) to Remedy Plaintiff's Intentional Spoliation of Electronically Stored Information ("Def. Sanctions Memo"), docket no. 105-1, at 14–15.[5] GEICO is, therefore, entitled to an adverse inference regarding the contents of those e-mails, both on summary judgment and, if necessary, at trial.

---

[4] Mr. Gerry DePace was Capricorn's lead programmer and the person most knowledgeable about its software. SOF ¶ 21. Mr. DePace died in June 2015 after a long illness. *Id.* at ¶ 63.

[5] For clarity and consistency, GEICO uses the same abbreviations as the Report when referring to the Parties' briefs and statements of facts.

## II.    APPLICABLE LAW[6]

A district judge may refer a motion for summary judgment to a magistrate judge "to conduct hearings, including evidentiary hearings, and to submit … proposed findings of fact and recommendations for the disposition" of that motion.  28 U.S.C. § 636(b)(1)(B).  "[A]fter being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."  FED. R. CIV. P. 72(b)(2).

"The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."  FED. R. CIV. P. 72(b)(3).  *De novo* review does not, however, require the district judge to "rehear the contested testimony" or to "conduct a new hearing on contested issues."  *Gutman v. Klein*, 2010 WL 4916722, *1 (E.D.N.Y. 2010) (*quoting United States v. Raddatz*, 447 U.S. 667, 674–75 (1980)).  "Moreover, even on a *de novo* review, a district court will generally 'refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.'"  *Mulberry Homes*, 2016 WL 5409244 at *1 (*quoting Haynes v. Quality Markets*, 2003 WL 23610575, *3 (E.D.N.Y. 2003)) (citation omitted).

Ultimately, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  FED. R. CIV. P. 72(b)(3).

---

[6] This section is adapted from the Court's recent decisions on Rule 72(b)(2) objections.  *See, e.g., Mulberry Homes VI, LLC v. Gargiulo*, 2016 WL 5409244, *1 (E.D.N.Y. 2016) (Hurley, J.).

## III.    OBJECTION TO SECTION III(C)(i) OF THE REPORT

Capricorn provided medical billing software to GEICO's regional office in Woodbury, New York.  Report at 3.  The software, called "Supercede" by Capricorn, included an Encovel Detection Module ("Encovel") intended to "detect fraud related to Nerve Conduction Velocity ('NCV') testing."  *Id.* at 5.  GEICO licensed Capricorn's Supercede software, including Encovel, through a Lease and Royalty Agreement ("LRA").  *Id.*  That the LRA permitted GEICO to use Encovel *inside* New York is undisputed.  *Id.* at 36–37.  The issue presented by this objection is whether there exists a genuine question of fact as to whether GEICO used Encovel *outside* of New York.

Capricorn's Amended Complaint offers three theories, all pled "upon information and belief," for how GEICO supposedly breached the LRA by using Encovel outside of New York:

- "Upon information and belief, GEICO used and is using a copy of Plaintiff's Encovel Detection Module or derivative work based on Plaintiff's Encovel Detection Module in GEICO's ATLAS System in the forty-nine (49) other states outside of New York, as well as in the District of Columbia, in violation of the terms of the LRA." Amended Complaint ¶ 43; *see also* Amended Complaint ¶¶ 38–40, 44, 101, 105.

- "Upon information and belief, based on the success of the New York NCV fraud claim, GEICO used the Encovel Detection Module [itself] … in New Jersey." Amended Complaint ¶ 39; *see also* Amended Complaint ¶¶ 42, 101, 102.

- "Upon information and belief, based on the success of the New York NCV fraud claim, GEICO used … programs *designed on the basis of* the Encovel Detection Module in New Jersey."  Amended Complaint ¶ 39 (emphasis added); *see also* Amended Complaint ¶¶ 42, 101, 102.

Capricorn has since abandoned the first two theories, and the third is unsupported by any evidence in the summary judgment record.  GEICO will address each in turn.

### A.   GEICO's nationwide ATLAS claims management system never included NCV fraud detection functionality.

"Although GEICO contemplated adding NCV fraud testing capabilities to AIS's software or to ATLAS, it is *undisputed* that it never did so."  Report at 37–38 (emphasis added).  The Magistrate's conclusion is supported by a parade of witnesses who testified that, although there was some discussion about the *possibility* of incorporating NCV fraud detection functionality into ATLAS, it never actually happened.  *See, e.g.,* Schoenstein Decl., Exhibit 11 ("Bradley Dep."), 158:10–17 ("Q: And was this change control [to put an NCV database in ATLAS] ever implemented?  A: Not to my knowledge."); Schoenstein Decl., Exhibit 16 ("Leone Dep."), 74:12–16 ("Q: Now, do you know whether NCV fraud detection capabilities were ever implemented in ATLAS?  A: While my time as a PIP director, it was not."); Schoenstein Decl., Exhibit 79 ("Brady Dep."), 114:12–14 ("Q: To your knowledge, was NCV fraud detection ever implemented in Atlas?  A: No."); Schoenstein Decl., Exhibit 26, ("Asciolla Dep."), 145:20–23 ("Q: Were you aware that there was discussion at some point at GEICO about creation a nationwide NCV database?  A: I was not aware.").[7]  Count I cannot be sustained on the basis of Capricorn's abandoned first theory of liability.

---

[7] All factual citations are to the existing summary judgment record.  GEICO purposefully does not rely on any new evidence not before the Magistrate.  *See supra* Section II (new evidence submitted in a Rule 72(b)(2) objection will generally not be considered if it could have been, but was not, presented to the magistrate).

**B.     GEICO never used Encovel outside of New York.**

Capricorn similarly abandoned its contention that GEICO used Encovel *itself* outside of New York.  *See* Plaintiff's Counter-Statement of Material Facts ("Pl. CSOF"), docket no. 107-20, at ¶¶ 159–194 (never asserting that GEICO used Encovel outside of New York). Instead, Capricorn now acknowledges that a *different* NCV fraud detection database, one developed by a GEICO employee named Seth Brady, was used outside of New York.  *Id.* at ¶ 176 ("GEICO concedes that it instructed its employee, Seth Brady, to develop an NCV fraud detection database for use outside of New York.  That database was used to screen NCV test results in New Jersey.") (quotations omitted); *see also* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. First SJ Opp."), docket no. 107-19, at 6 (Mr. Brady's database was used "in New Jersey and other states").  Count I cannot be sustained on the basis of Capricorn's abandoned second theory of liability.

**C.     A GEICO employee with no access to Encovel independently developed a database to check for duplicate NCV test results outside of New York.**

With Capricorn's first two theories of liability conceded, Count I hangs on a single question—was Mr. Brady's database "designed on the basis of the Encovel Detection Module"?

**i.     Mr. Brady never used Encovel and based his database on example NCV test reports, the "Microsoft Access Bible" self-help book, and online programming forums.**

Capricorn's counsel deposed Mr. Brady at length about this very question—whether his database was somehow derived from Encovel.  His testimony was unequivocal:

- Mr. Brady never used Encovel.  Brady Dep. at 117:18–20 ("Q: Did you personally ever use the NCV database used by GEICO's Woodbury office?  A: No.").

- Mr. Brady never saw the Encovel source code. *Id.* 113:25–114:2 ("Q: Have you ever seen the source code for the NCV database in Woodbury?  A: No.").

- Mr. Brady never saw the underlying Encovel database structure. *Id.* at 114:3–5 ("Q: Have you ever seen the table and field structure for the NCV database in Woodbury?  A: No.").

- Mr. Brady never communicated with Mr. DePace, the Capricorn employee who coded Encovel to GEICO's specifications. *Id.* at 114:18–20 ("Q: Do you recall ever communicating with Jerry DePace?  A: No."); SOF ¶ 24 ("One business requirement that GEICO instructed CMS to automate was a business process that GEICO developed to help it identify medical fraud [in] NCV tests.").

- Mr. Brady never had a copy of Encovel. *Id.* at 117:10–12 ("Q: Did you ever possess a copy of the NCV database used by GEICO's Woodbury office?  A: No.").

- Mr. Brady determined what fields to include in his database by reviewing example NCV test reports and speaking with GEICO's fraud investigators, known as the Special Investigations Unit ("SIU").[8] *Id.* at 116:10–14 ("Q: How did you determine which fields to include on the data entry form [for your NCV database]?  A: From reviewing nerve conduction study reports."), 42:21–22 ("Q: Who told you what fields were relevant?  A: The SIU department.").

- Mr. Brady, who is not a professional computer programmer, taught himself how to use Microsoft Access[9] to check for duplicate test results by reading a self-help book

---

[8] NCV test reports are prepared by medical professionals and list objective, quantitative timing results.  The reports themselves are not proprietary.  *See supra* n.2.

[9] Microsoft Access is a relatively simple database program included as a part of the Microsoft Office suite installed on GEICO computers.  *See* Brady Dep. at 40:21–41:19.

and online discussion boards. *Id.* at 40:14–20 ("Q: And so how did you go about the assignment of putting together something for NCV fraud detection? What did you do that you can remember?  A: I bought a book.  Q: What book did you buy? A: 'Microsoft Access Bible,' I believe was the title."), 46:18–21 ("Q: So you would just go [to online discussion boards regarding databases] to look and see if someone had a similar question to yours and if someone else had answered it?  A: Correct.").

### ii. The Report never mentions Mr. Brady's testimony or cites any evidence to contradict it.

Mr. Brady's testimony was a part of the summary judgment record and cited by both Parties. *See, e.g.,* Defendants' Response to Plaintiff's Counter-Statement of Material Fact in Support of its Opposition to Defendants' Motion for Summary Judgment ("Def. First SJ CSOF Response"), docket no. 107-50, ¶¶ 176–89 (responding to Capricorn's factual allegations regarding Mr. Brady).  The Report, however, never mentions it.  Instead, on the core issue of whether Mr. Brady "gather[ed] information from Capricorn's Encovel Detection Module" while developing his own database, the Report makes only one citation to the factual record.  Report at 38 (*citing* Def. First SJ CSOF Response ¶¶ 170–72).[10]

Even if accepted as true, the three factual assertions cited by the Report do not give rise to a genuine "question of fact … as to whether GEICO used … Capricorn's Encovel Detection Module" outside of New York, Report at 38, because none of them concerns Mr. Brady or his independent development of the NCV database used by GEICO outside of New York:

---

[10] The Report devotes more substantial discussion to whether the LRA, which "does not reference any geographical limitations," permitted GEICO to use Supercede, including Encovel, outside of New York.  Report at 35–37.  The Court need not resolve that question to grant summary judgment on Count I.  There is no evidence in the record that GEICO, in fact, used Encovel outside of New York, so whether GEICO was permitted to do so is immaterial.

- Paragraph 170 asserts, "At the same time, GEICO was asking internally if the someone could 'mirror this database?'" It quotes Mr. Asciolla's deposition transcript and cites an internal GEICO e-mail chain, Exhibits 26 and 70 of the Schoenstein Declaration, respectively. The e-mail chain discusses, among other things, working with "Gerry" (referring to Mr. DePace, *supra* n.4) to "put the [NCV fraud detection] program into Doc Magic." Doc Magic was a computer program used "quite some time" ago by GEICO's New York office to generate claim denial letters. Asciolla Dep., 70:3–11. Mr. Asciolla did not recall whether NCV fraud detection functionality was ever actually incorporated into DocMagic. *Id.* at 73:17–25. Neither the cited deposition testimony nor the cited e-mail chain mentions Mr. Brady.

- Paragraph 171 asserts, "In November 2011, GEICO began assembling requirements for a nationwide NCV database, by gathering screenshots from the systems designed by CMS." It cites Exhibit 71 of the Schoenstein Declaration. Exhibit 71 is an internal GEICO e-mail with requirements for an NCV database. Mr. Brady was not among the recipients, so the e-mail does not evidence the origins of his database.

- Paragraph 172 asserts, "In early 2012, a series of meetings were held to discuss the NCV data base and related issues." It cites Exhibits 72 and 191 of the Schoenstein Declaration. Exhibit 72 consists of five (5) calendar invites for internal GEICO meetings about developing requirements to incorporate NCV fraud detection in the national ATLAS claims management system, which undisputedly never occurred. *Supra* Section III(A). Mr. Brady was not included on any of the invites. Exhibit 191 is an internal GEICO e-mail forwarding a screenshot of Encovel data entry screen. Mr. Brady was not among the recipients. Both Exhibit 72 and Exhibit 191

corroborate Mr. Brady's testimony that he independently developed his database

without information about Encovel.

That GEICO discussed implementing, but never actually implemented, a national NCV

fraud detection database is undisputed. *Supra* Section III(A). None of the documents or

deposition testimony cited by the Report, however, addresses the origins of Mr. Brady's database

and so does not call into question his sworn testimony regarding its independent creation.

### iii.   Capricorn's scattershot opposition relies on factual misrepresentations and speculation.

Beyond the citations included in the Report, Capricorn's opposition to summary

judgment on Count I relies on a disingenuous presentation of the factual record, conflating a

never-implemented proposal to incorporate NCV fraud detection into GEICO's national ATLAS

claims management system, *supra* Section III(A), with Mr. Brady's rudimentary Microsoft

Access database:

> GEICO contemplated rolling out the database nationally, and assigned its
> employee Seth Brady to work on a NCV fraud detection system in New
> Jersey and other states. [Pl. CSOF] ¶¶ 161, 166. Brady undertook this
> effort by visiting Region 2 to inspect CMS and the NCV detection modules,
> after which, as the documents describe, he "patterned a database after the
> NY version to review fraud in other" states. [Pl. CSOF] ¶¶ 166–180;
> Schoenstein Dec. Ex. 80. The system Brady built in New Jersey saved
> GEICO another $88 million. [Pl. CSOF] ¶¶ 166–180.

Pl. First SJ Opp. at 6. Peeling back the rhetoric and examining the underlying citations confirms

that Capricorn has no *evidence* that Mr. Brady's database was derived from Encovel.

Pl. CSOF ¶ 161 concerns an e-mail from Andrea *Bradley* (not Seth *Brady*) regarding the

possibility of incorporating NCV fraud detection into GEICO's national ATLAS claims

management system. Pl. CSOF ¶ 166 merely asserts, "Prior to the work of Capricorn, GEICO

had no program for detecting NCV fraud."  Neither citation mentions Mr. Brady or his Microsoft Access database.[11]

Capricorn then bulk cites the same 15 statements of fact, Pl. CSOF ¶¶ 166–180, for three propositions—Mr. Brady visited GEICO's Woodbury office to "inspect" Encovel, Mr. Brady "patterned" his database after Encovel, and Mr. Brady's database saved GEICO $88 million. Similar to the scattershot approach unsuccessfully adopted by Capricorn in opposing summary judgment on Counts II and III, most of the cited statements are facially irrelevant.[12]  GEICO will, therefore, undertake to address each proposition and identify the relevant citations:

- Pl. CSOF ¶ 177 (and none of the 14 other cited paragraphs) concerns Mr. Brady's meeting in Woodbury.  As noted in Defendants' response to that statement of fact, the cited testimony does not, in fact, indicate that Mr. Brady "examined" the Encovel user interface.  Mr. Brady actually testified that he visited the Woodbury office one time for meetings with GEICO's fraud investigators about NCV fraud detection generally and that, in the course of that meeting, he "may have seen a user interface" for an NCV fraud detection system.  Brady Dep., 33:17–22.  Under examination by Capricorn's counsel, Mr. Brady explicitly confirmed that he never "talk[ed] to people in Woodbury about how that interface worked" or "ha[d] an opportunity to operate the interface" or "watch[ed] somebody operate it."  *Id.* at 34:1–13.  A passing glance

---

[11] Capricorn may have intended to cite Pl. CSOF ¶ 176, in which GEICO acknowledged that Mr. Brady was instructed "to develop an NCV fraud detection database for use outside of New York."  That Mr. Brady created a rudimentary Microsoft Access database to check for duplicate NCV test results outside of New York is undisputed, but that does not imply that his database was somehow "designed on the basis of" Encovel.  Amended Complaint ¶ 39.

[12] *See* Report at 47 ("Capricorn refers to the 'substantial evidence' it has of Defendants' misappropriation and summarily directs the Court to review over 100 statements of fact and scores of exhibits.  Reviewing these documents has consumed considerable judicial resources, yet absent any context, the Court cannot conclude that a genuine issue of fact exists sufficient to defeat summary judgment.").

at a computer screen is not an "examination" and, in the absence of any information

about how the program worked, access to its source code, or knowledge of its

underlying database structure, *supra* Section III(C)(i), cannot reasonably support an

inference that Mr. Brady's database was "designed on the basis of" Encovel.

- Pl. CSOF ¶ 178 (and none of the 14 other cited paragraphs) concerns the allegation

  that Mr. Brady "patterned" his database after Encovel.  When Capricorn's counsel

  inquired about the meaning of the "patterned" language directly during Mr. Brady's

  deposition, Mr. Brady explained that both databases were "looking for duplicate

  nerve conduction records."  Brady Dep., 86:20–87:6.  The fact that both databases

  performed the same basic function, flagging duplicate NCV test results for follow-up

  investigation, cannot reasonably support an inference that Mr. Brady's database was

  "designed on the basis of" Encovel when Mr. Brady never used Encovel, had no

  access to its source code, and had no knowledge of its underlying database structure.

  *Supra* Section III(C)(i).  Moreover, Capricorn acknowledges that it did not invent the

  concept of detecting NCV fraud by checking for duplicate test results and, therefore,

  has no exclusive rights in that functionality.  *See* Pl. CSOF ¶¶ 24 ("[GEICO] got the

  idea from a third party") and 160 (developed by third-party physician).

- None of Pl. CSOF ¶¶ 166–180 mentions an $88 million figure, so the evidentiary

  basis for Capricorn's assertion that Mr. Brady's database "saved GEICO another

  $88 million" is, at best, unclear.  Regardless, how much GEICO "saved" by using Mr.

  Brady's database is irrelevant to liability—whether Mr. Brady's database was

  "designed on the basis of" Encovel.  Amended Complaint ¶ 39.

Suspicions unsupported by the factual record cannot save Capricorn from summary judgment. *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. First SJ Memo"), docket no. 107-1, Section II (*citing Scentsational Techs., LLC v. Pepsico, Inc.*, 2018 WL 2465370, *5 (S.D.N.Y. 2018) ("When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.")). The *evidence* in the summary judgment record establishes that Mr. Brady never used Encovel, never saw the Encovel source code, never saw the Encovel database structure, never communicated with Capricorn about Encovel, and never had a copy of Encovel. *Supra* Section III(C)(i). On that record, no reasonable jury could conclude that Mr. Brady's database was "designed on the basis" of Encovel.

## IV.   OBJECTION TO SECTION III(B)(ii) OF THE REPORT

### A.   "Capricorn's actions, or lack thereof, demonstrate an intent to deprive Defendants of information."[13]

Despite an extraordinary (and correct) finding that Capricorn committed *intentional* spoliation, the Report recommends no sanction whatsoever—no adverse inference because the information lost was, the Magistrate concluded, "relatively unimportant" and no lesser sanction because Defendants were not "prejudiced" by the loss. With due respect to the Magistrate, imposing no sanction for Capricorn's intentional destruction of evidence would undermine the judicial process and encourage other unscrupulous parties to destroy (by similarly failing to preserve) unhelpful evidence. *See Resnik v. Coulson*, 2019 WL 1434051, *10 (E.D.N.Y. 2019) ("Ultimately, any sanction should be designed to: '(1) deter parties from engaging in spoliation;

---

[13] Report at 31.

(2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and

(3) restore the prejudiced party to the same position he would have been in absent the wrongful

destruction of evidence by the opposing party.'") (*quoting West v. Goodyear Tire & Rubber Co.*,

167 F.3d 776, 779 (2d Cir. 1999)).

     This is not a sympathetic case of inadvertent spoliation in the course of a good faith effort

to preserve. Capricorn did *nothing* to preserve its Electronically Stored Information ("ESI") for

nearly three years, including for more than two years after filing its Original Complaint. Report

at 28. Despite his declining health and intimate involvement in the development of the

Supercede software at the heart of this case, "Capricorn made no attempt to preserve or search

for relevant messages within DePace's Gmail account" from November 2014 (when its

preservation obligation arose) to June 2015 (when Mr. DePace died). *Id.*; *supra* n.4. "Plaintiff

similarly failed to take reasonable steps to preserve the e-mails of other Capricorn employees,

including the 12 [other agreed ESI] custodians." *Id.* Capricorn's principal, Dr. Silberstein,

admitted that he was aware of his preservation obligations and then *joked* about destroying ESI

while testifying under oath (and on video) for Capricorn pursuant to FED. R. CIV. P. 30(b)(6):

> Q. Did those backups cover all of the data stored within the 309 Main
> Street office?
>
> A. Yes. Which I'm glad you reminded me that it's time to throw some
> stuff out of storage.
>
> Q. I might suggest that you give it to your attorneys instead of throwing it
> out. But we can come back to that.
>
> A. No, we burn it.

Ricciardi Decl., Exhibit H (Capricorn Dep.) at 206:8–18. From that pattern and accumulation of

misconduct, the Report rightly concluded:

> Capricorn's actions, or lack thereof, demonstrate an intent to deprive
> Defendants of information. Not only should Capricorn have known that it

> had a duty to preserve ESI, Silberstein concedes that Plaintiff was in fact
> aware of this duty.  Silberstein's jokes during his deposition about
> throwing out and burning computer backup tapes demonstrates a contempt
> for Capricorn's preservation obligations that, when paired with Plaintiff's
> three-year delay in implementing preservation procedures, leads the Court
> to infer an intent to deprive Defendants of information.

Report at 31 (citation omitted).  GEICO certainly agrees with that conclusion, but respectfully

objects to the Magistrate's willingness to excuse Capricorn's intentional misconduct by declining

to impose *any* sanction.

**B.**      **An adverse inference is expressly authorized by**
**FED. R. CIV. P. 37(e)(2) and warranted here.**

"[U]pon finding that the party acted with the intent to deprive another party of the

information's use in the litigation," the Court may "presume that the lost information was

unfavorable to the party." FED. R. CIV. P. 37(e)(2)(A).  The Magistrate made that predicate

finding here and further acknowledged that "an additional finding of prejudice" is not required

"once an intent to deprive has been established[.]" *Supra* Section IV(A); Report at 31.  The

Magistrate declined to impose any sanction under Rule 37(e)(2)(A), however, because he

concluded that the information lost was not "significant." *Id.* at 31–32.  GEICO respectfully

disagrees.

Because "Capricorn did not undertake reasonable steps to preserve ESI," the e-mail

accounts of Mr. DePace and 12 other ESI custodians are now irretrievably lost.  Report at 29

("[I]t does not appear that the contents of DePace's Gmail account and the e-mails of the 12

custodians can be restored or replaced.").  Capricorn does not dispute that Mr. DePace was the

"person most knowledgeable" about its Supercede software, which is at the heart of this

litigation. *Supra* n.4 (*citing* SOF ¶ 21).  As the most knowledgeable Capricorn employee, the

content of Mr. DePace's e-mail account is "significant" on its face.  The fact that Mr. DePace

died shortly after Capricorn filed this action—tragically but nevertheless foreseeably after a long

illness—only heightens the import of his e-mails because Mr. DePace cannot be deposed or

otherwise "speak" except through his surviving writings. *See* Def. Sanctions Memo at 15.

The Report acknowledges that Defendants "need not show direct evidence of lost

information" but concludes that Defendants' "inability to offer *any* evidence … that refers to

unproduced e-mail undermines their contention that the lost ESI would have provided 'directly

exculpatory evidence.'" Report at 32 (*quoting* Reply Memorandum of Law in Further Support

of Defendants' Motion for Sanctions Under FED. R. CIV. P. 37(e)(2) to Remedy Plaintiff's

Intentional Spoliation of Electronically Stored Information ("Motion for Sanctions Reply"),

DE 105-38, at 8) (emphasis in original). Defendants need not identify specific "unproduced"

e-mails—the breadth of Capricorn's failure to preserve, which spans 12 of 14 agreed ESI

custodians, makes identifying specific cross-references and "missing links" difficult, if not

impossible—but Defendants can (and did) point to specific examples of other "exculpatory"

e-mails authored by Mr. DePace:

- "For example, in an e-mail to Dr. Silberstein nearly a year before this case was

  filed, Mr. DePace concluded that GEICO 'cannot be copying the code' for

  Supercede and admitted that he had no evidence GEICO was copying 'concepts'

  from Supercede either. Ricciardi Decl., Exhibit N (GEICO0007222)."

- "In another example, Mr. DePace reviewed a confidential GEICO document with

  technical details about its transition to AIS and concluded, 'I looked through the

  document and there is no fee schedule data being copied.'" Ricciardi Decl.,

  Exhibit O (GEICO0006537).

Def. Sanctions Memo at 15. "Defendants became aware of these e-mails—and, ironically, produced them back to Capricorn—because Mr. DePace … sent them, perhaps inadvertently, through a GEICO e-mail server." *Id.*

From those examples, the Court can infer, and the Magistrate should have inferred, that "Mr. DePace used his now-lost Gmail account, rather than GEICO's e-mail server, to exchange other similarly frank and 'unhelpful' communications with Dr. Silberstein" and grant an adverse inference accordingly. *Id.*; FED. R. CIV. P. 37, Advisory Committee Notes, 2015 Amendment, Subdivision (e)(2) ¶ 2 ("Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence.").

The Magistrate's insistence that Defendants identify specific, unproduced e-mails is unjustifiably stringent and only rewards Capricorn's intentional misconduct. *See NCA Investors Liquidated Trust v. Dimenna*, 2019 WL 2720746, *7 (D. Conn. 2019) (*citing Kronisch v. U.S.*, 150 F.3d 112, 128 (2d Cir. 1998) ("Courts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence, because doing so would subvert the purposes of the adverse inference, and would allow parties who have destroyed evidence to profit from that destruction.")).

### C.    Defendants were prejudiced by Capricorn's intentional misconduct.

Even if the Court ultimately concludes that an adverse inference is not warranted, "sanctions other than an adverse inference are available under Rule 37(e)(1) upon a showing that Defendants are prejudiced by the loss of information." Report at 32. To establish prejudice, "Courts in this Circuit generally require some proof that the lost 'evidence was not only

probative, but that it would affirmatively support the movant's claim.'" *Id.* at 32–33 (*quoting Ungar v. City of New York*, 329 F.R.D. 8, 15 (E.D.N.Y. 2018)).  Defendants have met that burden.

As described in Section IV(B) above, Defendants identified two e-mails from Mr. DePace, undisputedly Capricorn's most knowledgeable employee, that directly contradict Capricorn's theory of this case.  Logically, Capricorn and Dr. Silberstein would not "inten[d] to deprive Defendants of information" helpful to Capricorn's case but to deprive Defendants of information *unhelpful* to their case, like more damning admissions by their most knowledgeable employee, Mr. DePace.  *See* FED. R. CIV. P. 37, Advisory Committee Notes, 2015 Amendment, Subdivision (e)(2) ¶ 2.  Capricorn's intentional failure to preserve Mr. DePace's e-mails deprives Defendants of the opportunity to identify and rely upon other such admissions and, thereby, prejudices Defendants' ability to defend themselves against Capricorn's claims.  GEICO is, therefore, entitled to an adverse inference regarding the contents of Mr. DePace's now-lost Gmail account.

## V.    CONCLUSION

Lacking evidence to contradict Mr. Brady's sworn testimony about his independent development of a rudimentary database to check for duplicate NCV test results, Capricorn mixes-and-matches documents and deposition testimony about another project—the possibility of adding NCV fraud detection to GEICO's national ATLAS claims management system.  That indisputably never happened, Report at 37–38, and there is no evidence that Mr. Brady had anything to do with that project or those discussions.  *Supra* Section III(C).  Neither Capricorn nor the Report cites any evidence to contract Mr. Brady's sworn testimony so as to raise a genuine question of fact as to "whether GEICO used its own NCV database or Capricorn's

Encovel Detection Module" to detect potential fraud outside of New York.  Although not necessary to enter summary judgment for GEICO on Count I (or for Defendants on Counts II and III), Capricorn's intentional failure to preserve the e-mails of its most knowledgeable employee, who repeatedly expressed seeing no evidence to support Capricorn's claims, *supra* Section IV(B), warrants an adverse inference.

GEICO, therefore, respectfully requests that the Court (i) sustain these objections to the Report, (ii) grant Defendants' Motion for Sanctions and impose an appropriate sanction against Capricorn for its intentional failure to preserve important evidence, (iii) enter summary judgment against Capricorn and in favor on GEICO on Count I of the Amended Complaint, (iv) affirm the Report in all other respects, and (v) dismiss the Amended Complaint in its entirety.

Date:  September 13, 2019                             Respectfully submitted,

                                                      */s/  Matthew J. Ricciardi*

                                                      Joseph J. Saltarelli, Esq.
                                                        jsaltarelli@huntonak.com
                                                      **HUNTON ANDREWS KURTH LLP**
                                                      200 Park Avenue
                                                      New York, NY  10166
                                                      Tel:  (212) 309-1000
                                                      Fax:  (212) 309-1100

                                                      Charles D. Ossola, Esq. (*pro hac vice*)
                                                        cossola@huntonak.com
                                                      Matthew J. Ricciardi, Esq. (*pro hac vice*)
                                                        mricciardi@huntonak.com
                                                      **HUNTON ANDREWS KURTH LLP**
                                                      2200 Pennsylvania Avenue, NW
                                                      Washington, DC  20037
                                                      Tel:  (202) 955-1500
                                                      Fax:  (202) 778-2201

                                                      *Counsel for Government*
                                                      *Employees Insurance Company*

19

## CERTIFICATE OF SERVICE

The forgoing Objections to the Magistrate's Order, Report & Recommendation Pursuant to FED. R. CIV. P. 72(b)(2) was filed via the Court's CM/ECF system on September 13, 2019, and thereby automatically served on all counsel of record in this action.

_/s/  Matthew J. Ricciardi_

Matthew J. Ricciardi, Esq.